## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 98-CA-00457-SCT

*PARKER TRACTOR & IMPLEMENT COMPANY, INC.*

*v.*

*EDWARD JOHNSON, JR. d/b/a F & E FARMS*

### ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 02/13/1998 |
| TRIAL JUDGE: | HON. JOHN LESLIE HATCHER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | KEN R. ADCOCK |
| | MARK MORRISON |
| | JOHN B. GILLIS |
| ATTORNEYS FOR APPELLEE: | RICHARD B. LEWIS |
| | RALPH CHAPMAN |
| | DANA SWAN |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED - 01/10/2002 |
| MOTION FOR REHEARING FILED: | 11/18/99 |
| MANDATE ISSUED: | 1/31/2002 |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1. The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.

¶2. This appeal arose from a judgment of the Coahoma County Circuit Court based on a jury verdict. Edward Johnson, Jr. sued Parker Tractor & Implement Company Parker for negligence and breach of warranty arising from Parker's sale of a combine manufactured by Deere & Company.

¶ 3. The jury returned a general verdict for Johnson and awarded damages of $150,000. The trial court ordered a remittitur of $60,000, reducing the award to $90,000, and entered judgment accordingly. Parker appealed, raising seven assignments of error:

> **I. WHETHER THE JURY VERDICT WAS ERRONEOUS AS A MATTER OF LAW BASED UPON JOHNSON'S SPECULATIVE AND UNSUBSTANTIATED PROOF OF LOST PROFITS AND DAMAGES, IN ADDITION TO HIS COMPLETE FAILURE TO**

**MITIGATE THE SAME FOR 1996.**

**II. WHETHER THE TRIAL COURT ERRONEOUSLY PERMITTED THE JURY TO CONSIDER, IN VIOLATION OF [MRE 408](#), TESTIMONY AND DOCUMENTATION REGARDING PRE-TRIAL SETTLEMENT NEGOTIATIONS IN THIS CASE, AS WELL AS A RELATED REPLEVIN ACTION PENDING IN FEDERAL COURT BETWEEN JOHNSON AND DEERE CREDIT CORP.**

**III. WHETHER COMMENTS BY JOHNSON'S COUNSEL TO THE EFFECT THAT JOHN DEERE OR DEERE & CO. WOULD INDEMNIFY PARKER TRACTOR FOR ANY JUDGMENT RENDERED AGAINST IT CONSTITUTE REVERSIBLE ERROR.**

**IV. WHETHER THE TRIAL JUDGE'S IMPROPER COMMENTS IN OPEN COURT, INCLUDING COMMENTARY UPON THE WEIGHT OF THE EVIDENCE, PREJUDICED THE RIGHTS OF PARKER TRACTOR BEFORE THE JURY SO AS TO MERIT A NEW TRIAL.**

**V. WHETHER THE TRIAL COURT ERRED BY REFUSING TO EXCUSE THREE (3) PROSPECTIVE JURORS FOR CAUSE BY REASON OF THEIR, OR A FAMILY MEMBER'S PRIOR REPRESENTATION BY COUNSEL FOR APPELLEE.**

**VI. WHETHER THE TRIAL COURT'S ADMISSION OF THE AMENDED COMPLAINT INTO EVIDENCE, AND ITS PUBLICATION TO THE JURY, CONSTITUTED REVERSIBLE ERROR.**

**VII. WHETHER THE TRIAL COURT ERRED IN INSTRUCTING THE JURY ON THE APPLICABLE LAW GOVERNING BREACH OF WARRANTY CASES.**

**FACTS**

¶ 4. On August 25, 1994, Johnson purchased a John Deere CTS Rice Combine from Parker, a franchised John Deere dealership in Tunica, Mississippi. Parker's salesman, Walter Gray, discussed several combine models with Johnson. Johnson purchased the CTS model with an initial down payment of $30,634.36 and a financing agreement to pay $32,510.75 annually for five years. No payments were made after the down payment.

¶ 5. Appearing at trial as Parker's corporate representative, Gray testified that he knew Johnson planned to do some custom cutting with the combine, but he did not believe Johnson wanted to do a substantial amount of custom cutting in addition to working on his own farm. According to Gray, Johnson's use of the combine to cut 4,000 acres and for 500 hours over a two and a half year period was an average use for this type of combine and Johnson should not have expected more. He admitted the problems with Johnson's combine were excessive.

¶ 6. The new combine needed several repairs before it was finally delivered to Johnson. Over the next several months after the combine was delivered, Johnson complained about problems with the combine. Gray assured Johnson that any problems would be corrected and that the combine would provide reliable service. The combine had a one-year warranty that covered any problems with the combine. Under the terms of the warranty, either the company or the dealer would take care of any problems that arose with the

combine during the warranty period. Johnson was not billed for any repairs or service during the warranty period.

¶ 7. Johnson described the delivery delays caused by wiring and electrical problems with the combine. Johnson said Gray told him the wiring harness had "burned off" and the wiring was being replaced. He also described problems with the air conditioner, wipers, and emergency warning lights.

¶ 8. Junior Ward testified for the defense as an expert in combine mechanics and CTS combines. Ward described the operation of CTS combines and the problems with Johnson's combine. Beginning in September 1994, Ward made numerous service calls to Johnson's farm to work on the CTS combine. The following is a list of problems addressed by Ward on these service calls:

| 9/7/94 | replaced wiring harness, fixed air conditioner |
| 9/26/94 | replaced cracked fuel filter, fixed fuel gauge and fuel sensor |
| 9/29/94 | repaired lights and relays |
| 10/4/94 | repaired broken fingers in platform, replaced broken slip clutch |
| 10/28/94 | checked vibration in engine at high speed |
| 10/31/94 | replaced slipped clutch |
| 11/8/94 | unloading auger would not swing back |

Ward never noticed a loss of power when he drove the combine on these service calls.

¶ 9. Johnson's first recorded power complaint did not come until July 13, 1995. To address this problem, Ward took the combine into the Parker shop for repairs. He removed the fuel injection pump and shipped it to Mid South Diesel for testing. Mid South Diesel reported the pump was working properly. While working on the combine, Ward damaged the engine. John Deere replaced the engine, but Johnson said the combine continued to have problems. At the end of July 1995, Ward repaired the hydraulic pump and the transmission.

¶ 10. The greatest complaint, and that which Johnson related was the cause of his losses, was the operating speed of the combine. Johnson complained the combine would travel only 1.7 to 1.9 miles per hour, while he was told by Gray he could expect the combine speed to be from 4.5 to 5 miles per hour. According to Johnson, this more than doubled his harvest-time.

¶ 11. Bernie Wright testified for Johnson as an expert on farm combines and farm equipment. Wright stated Johnson's combine experienced more problems than a new machine should have experienced. He stated a new machine should have traveled 4.5 miles per hour in a clean bean field and 2.5 miles per hour in a clean rice field. According to Wright, a new CTS combine should have been able to harvest 3,000 to 3,500 acres in a season. Wright also testified custom cutting contracts were not usually in writing.

¶ 12. Ward, Parker's representative, stated that any problems with speed were likely caused by field conditions and the combine would run at about 3 miles per hour under normal conditions. Gray, Parker's corporate representative, stated a speed of 4 to 5 miles per hour in clean soy beans was reasonable.

¶ 13. Johnson made the combine available to John Deere for pick up and replacement in March 1995, but John Deere did not take possession of the combine. As of the date of the trial, the combine remained at

Johnson's shop.

¶ 14. Johnson described his losses for 1994 through 1996. In 1994, Johnson cut 1,362 acres of beans, but claimed he *could not* cut an additional 1,015 acres of beans and 150 acres of rice. He claimed he could have done custom cutting for farmers Swindoll, Berryhill, Smith, Zapponi and Eason at $25 an acre for beans and $55 an acre for rice. Before delivery of the combine, Johnson's father cut 80 acres of Johnson's rice at a cost of $4,675. Neither the farmers nor Johnson's father were called to testify.

¶ 15. In 1995, Johnson cut 1,935 acres of beans. He claimed he could have cut 1,300 more acres of beans and 250 acres of rice. In 1996, Johnson claimed he could have cut 2,800 acres of beans and 500 acres of rice. Johnson put his lost profit for 1996 at $26,000. Johnson did not have a written contract with any of these farmers, but according to Johnson's expert witness, written custom cutting contracts were not customary in the business.

¶ 16. Johnson's tax returns for 1990 through 1994 showed little or no profit from his farming operations. On his financing application for the combine, he listed his income for 1993 at $249,000 though his tax return only showed $122,000. The application also showed Johnson intended to do no custom cutting with the new combine and listed 550 total acres to be cut. Johnson admitted the application was inaccurate, but explained that Gray had completed the application so Johnson would be approved for financing.

¶ 17. Paul Watts testified for Johnson as an expert witness on accounting. Watts testified Johnson's cost per acre to operate the CTS combine in 1994 was $16.25 and his cost per acre in 1995 and 1996 was $13.78. The difference in costs was caused by the depreciation of the combine. These figures were used to project Johnson's lost income due to the malfunctioning combine.

¶ 18. Johnson asked the jury for an award of $90,000 in damages. The jury returned a general verdict for Johnson and assessed damages at $150,000. Upon motion by Parker, the trial judge ordered a remittitur of $60,000, reducing the total damages to $90,000, and entered judgment accordingly. Aggrieved by the judgment, Parker appealed.

**DISCUSSION**

¶ 19. In affirming, we find it necessary to address only issues I, III and IV. The remaining issues have no merit.

> **I. WHETHER THE JURY VERDICT WAS ERRONEOUS AS A MATTER OF LAW BASED UPON JOHNSON'S SPECULATIVE AND UNSUBSTANTIATED PROOF OF LOST PROFITS AND DAMAGES, IN ADDITION TO HIS COMPLETE FAILURE TO MITIGATE THE SAME FOR 1996.**

¶ 20. In this assignment, Parker argues Johnson failed to provide credible and substantial evidence supporting his claim for lost profits. We disagree.

¶ 21. Mississippi law allows a buyer suing for breach of warranty to recover consequential damages for "any loss resulting from general or particular requirements and needs of which the seller at the time of the contracting had reason to know and which could not reasonably be prevented by cover or otherwise...." Miss. Code Ann. § 75-2-715(2)(a) (Supp.2001). This authorizes the recovery of lost profits if the seller had reason to know at the time of contracting that if he breached the buyer would lose, the loss of such

profits is foreseeable, the lost profits are readily ascertainable, and the losses could not have been reasonably prevented. ***Massey-Ferguson, Inc. v. Evans***, 406 So.2d 15, 19 (Miss.1981). In this case, Parker's representative knew that Johnson intended on using the combine to custom harvest, regardless of what was entered on the application. It was reasonably foreseeable that any problems with the combine, including a reduced speed, would cause Johnson to lose anticipated profits.

¶ 22. Johnson testified that when he purchased the combine he was assured that it would get four-and-a-half to five miles an hour. However, during harvest Johnson was only able to get from 1.7 to 1.9 miles an hour, more than doubling his harvest time. On direct examination, Johnson gave the names of individuals for whom he did custom work and those which he lost due to the inability of the combine to work at full speed.

¶ 23. In ***Hawkins Hardware Co. v. Crews***, 176 Miss. 434, 441, 169 So. 767, 769 (1936), the Court held that "[w]hen the cause of the damages is reasonably certain, recovery is not to be denied because the data in proof does not furnish a perfect measure thereof ... it is enough that sufficient facts are given from which the jury may safely make at least a minimum estimate."

¶ 24. Additionally, damages are speculative only when the cause is uncertain, not when the amount is uncertain. *[Adams v. U.S. Homecrafters, Inc.,](#)* 744 So.2d 736, 740 (Miss. 1999) (*citing **Shell Petroleum Corp. v. Yandell***, 172 Miss. 55, 67, 158 So. 787, 790 (1935)).

¶ 25. In the case sub judice, all existing records which could have shown pertinent losses were introduced, including a summary of loss calculations and Johnson's tax reports. Additionally, the acreage was calculated at the previous speed of an older combine compared with the slower speed with the lemon. This is sufficient to show the loss of profits. In addition, since the contracts that Johnson had to break with other farmers were not in writing, the best evidence possible was Johnson's testimony. He listed those farmers who he had contracts with, the amount of losses suffered and the amount he paid his father for help in cutting. We have held that lost profits in a business can be allowed if "the data of estimation are so definite and certain that they can be ascertained reasonably by calculation." ***Puckett Mach. Co. v. Edwards***, 641 So.2d 29, 37 (Miss. 1994).

¶ 26. Johnson is an expert in his own right. He is a 44 year-old man who has spent most of his childhood and his entire adult life farming. He was the one in charge of running his business, and he would have first hand knowledge of profits and losses. In addition to his testimony, Johnson called an accountant with experience in custom harvesting to calculate the damages using testimony regarding contracts and the usual rate charged for custom harvesting.

¶ 27. Although none of Johnson's customers testified, Parker had the right to call them if it felt it could rebut any of Johnson's testimony. Parker did not do so. The testimony given by Johnson and his expert accountant was sufficient for the jury to determine the amount of damages necessary. The Court in ***Puckett Mach.*** stressed that "[i]f he has records available, they must be produced. While certainty is not required, a party must produce the best that is available to him." ***Puckett Mach.***, 641 So.2d at 37 (quoting ***Eastland v. Gregory***, 530 So.2d 172, 174 (Miss.1988)). In this case, the testimony of Johnson and his accountant was the best evidence available.

¶ 28. It is totally reasonable to find that a defective combine would reduce the amount of farm work that the owner of the combine can perform and that the owner of the combine would surely, as a result, suffer a loss of profits. The combine was a lemon, and Johnson was forced out of business for some time. Johnson put

on evidence of his losses, and the burden was shifted to Parker to negate any damages. Parker failed to do so and is bound by the award.

### III. WHETHER COMMENTS BY JOHNSON'S COUNSEL TO THE EFFECT THAT JOHN DEERE OR DEERE & CO. WOULD INDEMNIFY PARKER TRACTOR FOR ANY JUDGMENT RENDERED AGAINST IT CONSTITUTE REVERSIBLE ERROR.

¶ 29. In this assignment of error, Parker argues Johnson's counsel made improper comments to the effect that John Deere or Deere & Company would indemnify Parker for any losses associated with the case sub judice. The following exchange occurred during cross-examination of Parker's corporate representative, Walter Gray:

BY MR. CHAPMAN (Johnson's attorney):

Q. And Deere and Company, John Deere, the people that send these combines down here they are covering Parker Tractor for any losses associated with this case, aren't they?

MR. ADCOCK (Parker's attorney): Your Honor, we object. We object to that.

BY THE WITNESS (Gray):

A. I can't answer that.

MR. ADCOCK: It's totally irrelevant.

MR. CHAPMAN: I'll withdraw the question.

¶ 30. This question was never answered by the witness and withdrawn. We acknowledge that we have previously held no reference should be made to the fact that a defendant is covered by liability insurance, *Morris v. Huff*, 238 Miss. 111, 117 So.2d 800 (1960). However, the question posed in this case did not rise to that level. In the case relied upon by Parker, *Scott County Co-op v. Brown*, 187 So.2d 321 (Miss.1966), the plaintiff's counsel remarked during his closing statement that "we will collect a judgment in such a way as to not hurt the defendants" and "Gentlemen, in all deference to Scott County, I believe you have confidence in us lawyers to know that we will collect a judgment in such a way as to not hurt the defendants, Junior Madden or the Scott County Co-op." *Id.* at 325. There is no mentioning of liability insurance even slightly similar in the present case. The statements were merely made to show that Parker was an agent under the control of John Deere and that both were liable, even though the seller was the only one named in the complaint. The litany of criminal cases in which we affirm a verdict when a District Attorney makes all sort of statements much worse than these here are too numerous to cite. This assignment of error is without merit.

### IV. WHETHER THE TRIAL JUDGE'S IMPROPER COMMENTS IN OPEN COURT, INCLUDING COMMENTARY UPON THE WEIGHT OF THE EVIDENCE, PREJUDICED THE RIGHTS OF PARKER TRACTOR BEFORE THE JURY SO AS TO MERIT A NEW TRIAL.

¶ 31. On cross-examination of Parker's expert, Mike Roberts, Johnson's attorney questioned Roberts about when the combine was manufactured. Parker asserts that the trial judge's following comment during

questioning of Roberts constitutes reversible error.

BY MR. CHAPMAN:

Q. Do you know if the Johnson Combine was made on a Monday?

BY THE WITNESS (Roberts):

A. No, sir, I do not.

BY MR. CHAPMAN:

Q. After a holiday?

BY THE WITNESS:

A. No idea.

BY MR. CHAPMAN:

Q. Is there any way we can check?

MR. ADCOCK: Your Honor, we object.

THE COURT: How about Friday the 13th?

According to the record, Parker's counsel made no objection to the judge's remark, and the examination continued.

¶ 32. At the next break in the proceedings, outside the presence of the jury, Parker moved for a mistrial based on the judge's "Friday the 13th" comment. Parker argued the judge's comment constituted a comment on the evidence and was therefore improper and prejudicial. In response, the judge stated the "Friday the 13th" remark was intended in jest and received in jest by everyone in the court room and was an attempt by the court to inject a note of humor into an otherwise very dull case. The judge denied the defense motion for a mistrial, but offered to instruct the jury that his "Friday the 13th" remark was made in jest. Parker refused the judge's offer to so instruct the jury. Parker now claims the judge's remark was so prejudicial as to warrant reversal.

¶ 33. Two problems exist with Parker's argument. First, according to the record, Parker did not make a contemporaneous objection when the "Friday the 13th" remark was made. A contemporaneous objection is necessary so that the judge can make a determination of prejudice. "Strictly speaking, timeliness means the objection and motion must be made contemporaneously with the allegedly improper utterance. This is well-known as the 'contemporaneous objection rule.' Contemporaneousness is critical because it allows the judge to avert a mistrial, if possible, by admonishing the jury to disregard the utterance." *Ivy v. General Motors Acceptance Corp.*, 612 So.2d 1108, 1114 (Miss.1992) (emphasis in original & citations omitted). The record indicates Parker did not object to the judge's remark until long after the witness had completed his testimony. Even with this delay, the trial court offered to admonish the jury and to give a curative instruction, stating the "Friday the 13th" comment was made in jest. Parker, however, refused the judge's offer to issue the instruction.

¶ 34. Second, in oral argument before this Court, counsel for Parker asserted for the first time that he did object and ask for a mistrial when the judge made the remark, but the objection and motion were not recorded by the court reporter. The proper method for supplementing an allegedly incomplete record, however, is through a bill of exceptions, not through oral argument before an appellate court. *See* Miss.Code Ann. § 9-13-31 (1991); Miss. R. Civ. P. 46 cmt. *See also* M.R.A.P. 10(e) (motion to correct or modify record). Parker provided no bill of exceptions and has not moved the Court to correct the record. He is held to the record before this Court.

¶ 35. In addition to Parker's failure to properly preserve this point of error, the judge's comment was so brief and trivial that it did constitute an improper comment on the evidence. There is no reversible error here.

## CONCLUSION

¶ 36. For these reasons, the judgment of the Coahoma County Circuit Court is affirmed.

**AFFIRMED.**

> **DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., AND COBB, J. WALLER, J., NOT PARTICIPATING.**

> **SMITH, PRESIDING JUSTICE, DISSENTING:**

¶ 37. By granting Johnson's motion for rehearing, the majority has impermissibly allowed Johnson another bite at the appellate apple. In its prior opinion, this Court rejected Johnson's same arguments on the very issues here addressed by the majority and, finding error, reversed and remanded the case for a new trial. In today's opinion, the majority simply revisits issues already thoroughly considered and passed upon in our original opinion. *See Brandau v. State*, 662 So. 2d 1051, 1052 (Miss. 1995) (stating that this Court will not revisit issues passed on in its original opinion). *See also* M.R.A.P. 40(a). For the following reasons, I respectfully dissent.

### I.

¶ 38. The majority concludes that Johnson provided credible and substantial evidence supporting his claim for lost profits. In order to recover on a claim for lost profits, the profit lost must be proven to a reasonable certainty, and the lost profits must not be based on speculation. *Fred's Stores of Miss., Inc. v. M&H Drugs, Inc.*, 725 So. 2d 902, 914 (Miss. 1998). In my view, Johnson failed to carry his burden of proving lost profits to a reasonable certainty. Johnson testified that his losses for 1994, 1995, and 1996 were the result of the defective combine. For 1996 specifically, Johnson's proof consisted only of his statement that his lost profits totaled $26,000. While Johnson's testimony is certainly relevant to his losses, his testimony alone is simply too speculative to support an award for lost profits in this case. Johnson produced no other evidence in the form of contracts, witness testimony, or financial records to establish his claims of lost acreage. Nor did he establish that, time and weather permitting, he would have been able to cut the additional acreage.

¶ 39. As in the case sub judice, the only support offered by the plaintiff in *Puckett Mach. Co. v. Edwards*, 641 So. 2d 29, 27-29 (Miss. 1994), was oral testimony. In that case, Edwards contended his Caterpillar

518 tree shearer's slower-than-expected output required him to hire additional sawmen. While Edwards testified his out-of-pocket cost was $100 per day, no documentary evidence such as truck tickets, payroll receipts, tax records, or banking records was offered in support of his claim. In holding that Edwards' testimony was insufficient to prove his claim for consequential damages, this Court relied on *Yazoo & M.V.R. Co. v. Consumers' Ice & Power Co.*, 109 Miss. 43, 67 So. 657 (1915). *Puckett Mach.*, 641 So. 2d at 37. In *Yazoo*, this Court cited the rule on the recovery of profits lost through breach of contract: "[l]osses of profits in a business cannot be allowed, unless the data of estimation are so definite and certain that they can be ascertained reasonably by calculation." *Yazoo*, 67 So. at 658 (citations omitted).

¶ 40. The majority notes that in addition to his own testimony, Johnson called an accountant, Paul Watts, to calculate the damages using testimony regarding contracts and the usual rate charged for custom harvesting. Watts's testimony was based on conjecture and speculation. His testimony was not based on any audit or review of facts, circumstances or documents, if any, underlying Johnson's lost profits claims. Watts only repeated Johnson's own speculative testimony concerning his lost acreage for 1994, 1995, and 1996. In fact, Watts admitted he had done nothing to prepare his calculations other than speaking with Johnson before testifying. Because Watts's testimony was based on nothing more than speculation and conjecture, it cannot be said that his testimony was helpful to the trier of fact in understanding the damage evidence presented. Therefore, Watts's testimony should not have been admitted. *See Peoples Bank & Trust Co. v. Cermack*, 658 So. 2d 1352, 1363 (Miss. 1995) (holding that expert testimony is admissible only if it helps the finder of fact understand the evidence or determine a fact in issue).

¶ 41. Johnson also named five farmers for whom he could have engaged in custom cutting, yet not one of these farmers was called to verify that they had the acreage available to cut and that they made other arrangements only because Johnson was not able to cut their crops. The majority erroneously states that it was somehow Parker's duty to call these witnesses to rebut Johnson's testimony. However, it was Johnson who bore the burden of proving lost profits by a preponderance of the credible evidence. Parker had no obligation to call Johnson's alleged customers on its behalf.

¶ 42. Because Johnson failed to carry his burden of proving lost profits and because it is unknown how much the jury awarded for lost profits under its general verdict, this Court should reverse and remand for a new trial.

## II.

¶ 43. The majority also finds that statements by Johnson's attorney to the effect that John Deere would pay the costs of any judgment returned against Parker were merely made to show that Parker was an agent under the control of John Deere and that both were liable, even though the seller was the only one named in the complaint. As this Court found in *Scott County Co-op v. Brown*, 187 So. 2d 321, 325 (Miss. 1966), such a statement is tantamount to saying that a defendant is protected by liability insurance, the only purpose for which is to inform the jury that someone other than the defendant would pay the judgment. While Johnson did arguably have a need to establish the relationship between Parker and Deere, the assertion that any and all of Parker's losses associated with this case would be covered by Deere was improper. The source of payment for the judgment was not relevant to the issues of liability or damages.

¶ 44. Furthermore, the majority's perfunctory reference to "the litany of criminal cases in which we affirm a verdict when a District Attorney makes all sort of statements much worse than these" is entirely irrelevant to the issue before this Court. I fail to recall any case before this Court in which a prosecutor commented on

the fact that a defendant was covered by liability insurance. Perhaps the majority should reference one of these cases, which are, as the majority states, "too numerous to cite."

## III.

¶ 45. Finally, the majority finds that the trial judge's "Friday the 13th" comment "was so brief and trivial that it did not constitute an improper comment on the evidence." It should first be noted that the brevity and triviality of a comment is properly considered in examining the question of whether the comment constitutes harmless error or prejudicial error, not whether the comment constitutes error in the first place. Furthermore, though I believe the judge's comment constituted, at most, harmless error, I disagree with the majority's conclusion that the comment was not improper. Though humor is appropriate at times, a trial judge must take care that its statements are not made at a time or in a manner which would be construed by the jury as a comment by the judge on any evidence. The judge's comment in the case sub judice went directly to the quality of the combine. Though trivial and brief, and therefore harmless, it was most certainly improper.

## IV.

¶ 46. Because Johnson failed to carry his burden of proving lost profits and because of the improper reference by Johnson's counsel to Deere's covering any losses by Parker, I would reverse the judgment in favor of Johnson and remand for a new trial. Because the majority finds no error in these issues, I respectfully dissent.

**PITTMAN, C.J., AND COBB, J., JOIN THIS OPINION.**