912 So.2d 175 (2005)
BENCHMARK HEALTH CARE CENTER, INC., Appellant/Cross-Appellee
v.
H. Ted CAIN d/b/a Quest Rehab, Appellee/Cross-Appellant.
No. 2003-CA-02399-COA.
Court of Appeals of Mississippi.
October 4, 2005.
*177 Charles W. Wright Jr., Brookhaven, attorney for appellant.
Darren E. Gray, attorney for appellee.
Before LEE, P.J., MYERS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. H. Ted Cain d/b/a Quest Rehab (Quest) filed suit against Benchmark Health Care, Inc. (Benchmark) in the Circuit Court of Lauderdale County on August 22, 1998, asserting breach of contract. On July 30, 2003, a Lauderdale County jury returned a verdict in favor of Quest and ordered Benchmark to pay damages in the amount of $130,774.48. The trial court entered judgment on the jury verdict. Aggrieved by the judgment of the circuit court, Benchmark appeals to this Court, and Quest cross-appeals. Finding no error, we affirm.

STATEMENT OF FACTS
¶ 2. On June 16, 1997, Quest entered into a one-year contract with Benchmark. The contract generally provided that Quest would provide rehabilitation services, including physical therapy, speech therapy, and occupational therapy, in the nursing facility owned by Benchmark. Benchmark would be responsible for billing and collecting payment from the patients treated by Quest.[1] Quest would be required to submit an invoice each month for the services it rendered, and Benchmark would be responsible for paying the invoice within thirty days. Benchmark was required *178 to remit payment to Quest whether or not Benchmark was able to collect payment for Quest's services. The contract provided that either party could terminate the contract for "just cause" upon thirty days' prior written notice. Furthermore, either party could terminate the contract for any reason after the initial one-year term had expired upon giving sixty days' notice to the other party. Both parties began performance under the contract in June 1997.
¶ 3. From the outset it appears that Benchmark fell behind in payments. For the first two months, June and July 1997, Benchmark paid Quest's invoices in full, although payment was not timely. Quest's invoice for August was not paid until December 1, and then only partial payment was remitted. Quest continued to submit invoices for the services rendered in October, November, and December. No additional payment was received until December 16, when Benchmark paid the outstanding balance on the August invoice. On the same day Benchmark notified Quest in writing that it was cancelling the contract effective January 31, 1998. No cause was given for this cancellation.
¶ 4. Quest continued to perform under the contract in January, but on January 9, 1998, Benchmark notified Quest again by letter to discontinue all therapy at the facility. By this time, the amount outstanding and unpaid by Benchmark was $197,496.17, which included invoices for the months of September, October, November, and December, 1997, and January, 1998. Benchmark paid Quest $100,000 on January 20 and $12,021.69 on March 19. At this point, Benchmark had paid $219,451.08 of the $298,925.56 billed by Quest since the contract was entered into in June 1997. The difference between the amount paid by Benchmark and the amount alleged by Quest to be owed was $79,474.48. On March 27, 1998, Quest made demand on Benchmark for payment of the $79,474.48. Benchmark submitted a check for $30,616.71 to Quest as payment in full, less claims outstanding of $4,205.49. Quest returned this payment to Benchmark, and on August 28, 1998, filed suit for breach of contract and damages of $79,474.48 plus lost profits in the amount of $99,086.97.
¶ 5. On July 30, 2003, a jury found that Benchmark had breached the contract with Quest, and rendered a general verdict for Quest in the amount of $130,774.48. This amount was a single figure; the jury was not asked to delineate what part of the verdict represented lost profits and what part was an award for specific damages. Following the verdict, both parties filed a flurry of post-trial motions. Benchmark filed a motion for judgment notwithstanding the verdict and a motion for remittitur or, in the alternative, a new trial. Quest filed a motion for award of prejudgment interest and a motion for additur. The trial court entered judgment on the jury verdict on September 8, 2003, and overruled all post-trial motions filed by both parties, including motions for reconsideration. Benchmark timely appealed, and Quest cross-appealed.

ISSUES AND ANALYSIS

I. WHETHER THE TRIAL COURT ERRED BY ADMITTING EVIDENCE CONCERNING QUEST'S LOST PROFITS.
¶ 6. Benchmark asserts that the jury verdict was excessive, and that Quest *179 failed to prove lost profits by a preponderance of the evidence. The principal evidence presented at trial on the issue of lost profits was the testimony of Quest's accountant, Tommy Kuluz, and a report that he prepared regarding his lost-profit computations. Benchmark argues that Quest did not prove lost profits to a reasonable certainty because Kuluz's testimony was based entirely on "speculation and conjecture." According to Benchmark, Kuluz failed to "produce or testify concerning any of the supporting documents" he relied on in making his estimation of lost profits, and that he failed to consider a contract entered into between Quest and Lakeview nursing home following the termination of the Benchmark/Quest contract. Benchmark contends that the profits realized from the Lakeview contract should have been considered by Kuluz in mitigation of damages. Benchmark also argues that the trial court erred in failing to order a remittitur to exclude all damages for lost profits. Quest counters that the lost profit calculations are reasonably based on the actual amounts billed by Quest during the two-month period from November 1, 1997, through December 31, 1997.

STANDARD OF REVIEW
¶ 7. The standard of review regarding the admission or exclusion of evidence is abuse of discretion. Tatum v. Barrentine, 797 So.2d 223, 230(¶ 12) (Miss.2001) (citing Thompson Mach. Commerce Corp. v. Wallace, 687 So.2d 149, 152 (Miss.1997)); Partain v. Sta-Home Health Agency of Jackson, Inc., 904 So.2d 1112, 1119(¶ 17) (Miss.Ct.App.2004). This Court will not reverse the trial court's decision regarding the admission or exclusion of evidence unless the error adversely affects a substantial right of a party. Harrison v. McMillan, 828 So.2d 756, 765(¶ 27) (Miss.2002).

DISCUSSION
¶ 8. In Mississippi, a party may recover for loss of future profits in a breach of contract action so long as such profits are proved to a reasonable certainty and not based on mere speculation or conjecture. Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss.1987). The rule that uncertain damages cannot be recovered applies only to the nature, not the extent, of the damages. If the nature of the damages is certain but the extent is uncertain, recovery is not prevented. Id. at 1353. In Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss.1984), the Mississippi Supreme Court addressed this rule stating:
[W]here it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages. This view has been sustained where, from the nature of the case, the extent of the injury and the amount of damage are not capable of exact and accurate proof. Under such circumstances, all that can be required is that the evidence  with such certainty as the nature of the particular case may permit  lay a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage. The plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss.
(Emphasis added). The supreme court further provided that when a plaintiff has suffered monetary damage and has produced the best evidence available to him, he should not be denied recovery simply because the amount of damages cannot be ascertained with the same precision as an ordinary claim for damages. Thomas v. Global Boat Builders & Repairmen, Inc., *180 482 So.2d 1112, 1117 (Miss.1986). Accordingly, in this type of situation, Quest was only required to put on sufficient proof to enable the finder of fact to reach a fair and reasonable estimation of the damages.
¶ 9. We find that the evidence presented by Quest regarding lost profits was not purely speculative. On cross-examination, counsel for Benchmark repeatedly questioned Kuluz whether his estimation of lost profits involved some amount of speculation. Kuluz understandably replied that his estimate did involve a certain amount of speculation, but that the report he prepared was based upon the specific evidence of two previous months of Quest's operations with Benchmark. This being the case, we find that the testimony of Kuluz and the report he prepared reflected a fair and reasonable estimate of Quest's projected lost profits. While some amount of speculation was necessarily involved in a computation of lost profits that had never actually been realized, Kuluz's report and testimony were projected from actual profits realized from November 1, 1997, through December 31, 1997. Extrapolating actual past profits to reach a figure that represented anticipated future profits was a reasonably certain method of proving lost profits. As the trial court judge stated, Benchmark's argument misuses the word "speculation." Some speculation must be involved in an attempt to compute unrealized profits.
¶ 10. Benchmark argues that Quest did not provide documentation for Kuluz's preparation of the report estimating lost profits. We find that, at trial, Kuluz provided documentation explaining his methodology and testified as to his method of arriving at the lost profits figure of $99,086.37. He stated that the estimate:
represents potential profits for this particular account for Quest Rehab had it gone to the end of the contract term. And it was based on a two-month period, which was a realistic estimate of their revenues that were going to be generated by that account. And we took the direct expenses of the employees and the labor that was on that account and allocated overhead and came to a bottom line to get to a profit figure for that particular Benchmark account....
The bottom line profit figure Kuluz arrived at for the two months was then reduced to an "estimated net income per day" figure of $892.67. This figure was then multiplied by the estimated number of days left in the Benchmark/Quest contract, 111 days, for a total of $99,086.37.[2] When asked why he chose the revenue months of November and December, 1997, to compute his estimate, Kuluz responded that those months reflected a median between the months of highest profit and the months of lowest profit. Because this descriptive documentation and testimony was presented at trial, we find that there was ample evidence for the court to examine Kuluz's methodology and then determine the estimate to be reasonably certain.
¶ 11. Finally Benchmark argues that Kuluz's estimates are incorrect because he failed to consider, in mitigation, a contract between Quest and Lakeview entered into on March 1, 1998. Kuluz admitted at trial that there was a contract between Quest and Lakeview. Although he did not include this mitigation in his calculation of lost profits, the existence of the contract *181 was nevertheless presented to the jury. The jury was instructed to consider evidence of mitigation of damages. Thus, despite the fact that the mitigation was not included in Kuluz's estimate, the jury, in its discretion, was still able to deduct the amounts received from the Lakeview contract in mitigation. In fact, as discussed in the next issue, this appears to be exactly what happened.

II. WHETHER THE TRIAL COURT ERRED BY REFUSING TO GRANT EITHER ADDITUR OR REMITTITUR.
¶ 12. Benchmark appeals on the issue of whether the trial court should have granted a remittitur on the jury verdict, while Quest cross-appeals on the issue of whether the trial court should have granted an additur for lost profits sustained by Quest. Benchmark argues simply that the jury was unduly influenced by bias, prejudice, or passion. Quest argues that, because the jury only awarded $130,774.48, it is clear that the jury did not include in its award both the $79,474.48 alleged specific damages and the $95,000 alleged lost profits. Because the lost profits were "proven by a preponderance of the evidence and to a reasonable certainty," Quest argues that the court should have granted an additur on the jury verdict.

STANDARD OF REVIEW
¶ 13. The standard of review of a trial court's decision regarding remittitur is the same as the standard for additur. Whitten v. Cox, 799 So.2d 1, 18(¶ 45) (Miss.2000). The decision of the trial court must amount to abuse of discretion for this Court to reverse. Burge v. Spiers, 856 So.2d 577, 580(¶ 6) (Miss.Ct.App.2003). The jury award will not be set aside unless it is outrageous and unreasonable. Teasley v. Buford, 876 So.2d 1070, 1077(¶ 10) (Miss.Ct.App.2004).

DISCUSSION
¶ 14. Mississippi Code Section 11-1-55 (Rev.2002) states the grounds on which a court may impose an additur or remittitur. The court must find that "the damages are excessive or inadequate for the reason that the jury ... was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence." Benchmark argues the correct legal standard, but fails to include any supporting facts to substantiate its assertion. Quest's argument misinterprets the law on additur. The statute provides that additur is only available when the court finds evidence of jury bias, prejudice, or passion, or where the award is against the overwhelming weight of evidence. It is not available to a plaintiff merely because a jury awards less than the plaintiff alleges to be owed. This being the case, we find that it was well within the trial court's discretion to refuse both additur and remittitur.
¶ 15. While it is impossible to determine exactly how the jury calculated its damage award, both parties contend that the jury's award of $130,774.48 in damages was likely divided into specific damages of $79,474.48, and lost profits of $51,300. Ted Cain testified that the Lakeview contract commenced on March 1, 1998, almost two months after Benchmark's wrongful cancellation of the contract with Quest. Although Kuluz testified that he had subsequently computed a $21,000 per month profit on the Lakeview contract, documentation introduced at trial only showed invoices to Lakeview commencing in April of 1998. Accordingly, the jury would have been well within its discretion to reduce Quest's claim for lost profits by the amount estimated to have been earned on the Lakeview contract from either March or April to June 16, 1998. If the parties' *182 assumption regarding the jury's calculation of lost profits is correct, it would appear that the jury reduced Quest's claim for lost profits by approximately two to two and one-half months' profits from the Lakeview contract. The trial court did not abuse its discretion in refusing to grant either an additur or remittitur.

III. WHETHER THE TRIAL COURT ERRED IN SUSTAINING QUEST'S MOTION IN LIMINE PROHIBITING PAROL EVIDENCE CONCERNING PAYMENT.
¶ 16. Benchmark asserts that parol evidence should have been introduced at trial which tends to establish that an extrinsic agreement existed between Benchmark and Quest regarding receipt of payment and early termination of the contract. Benchmark argues that "before, after, and during the term of the contract" Quest represented to Benchmark that Benchmark would only be required to pay Quest out of reimbursements from Medicare. Benchmark claims that these statements were admissible due to the ambiguity of the contract, and that Quest opened the door to these statements during testimony. Quests responds that the trial court ruled correctly that the contract is not ambiguous, and that the contract is clear on the terms of payment and termination. We agree with Quest.

STANDARD OF REVIEW
¶ 17. "The parol evidence rule is one of substantive law rather than evidence." Turner v. Terry, 799 So.2d 25, 32(¶ 16) (Miss.2001) (citing Estate of Parker v. Dorchak, 673 So.2d 1379, 1383 (Miss.1996)). Whether parol evidence will be admitted depends on whether the terms of the contract in question are ambiguous. Heritage Cablevision v. New Albany Elec. Power Sys., 646 So.2d 1305, 1313 (Miss.1994). "The initial question of whether the contract is ambiguous is a matter of law." Lamb Constr. Co. v. Renova, 573 So.2d 1378, 1383 (Miss.1990). Our standard of review on questions of law is de novo. Smith v. Smith, 872 So.2d 74, 79(¶ 15) (Miss.Ct.App.2004).

DISCUSSION
¶ 18. "One of the fundamental principles of contract law is that parol evidence will not be received to vary or alter the terms of a written agreement that is intended to express the entire agreement of the parties on the subject matter at hand." Housing Auth., City of Laurel v. Gatlin, 738 So.2d 249, 251(¶ 10) (Miss.Ct.App.1998). Parol evidence of the intention of the contracting parties may be admitted only when the terms of the agreed-upon contract are ambiguous. Byrd v. Rees, 251 Miss. 876, 881, 171 So.2d 864, 867 (1965). In the present case the trial court concluded that the parties' intentions were unambiguously specified in the contract, and we agree with the court's conclusion. The contract between Quest and Benchmark provides that Benchmark will be "responsible for billing for services, collecting payment from third party payors and/or patient[s]." The clear terms of the contract state that Benchmark is responsible "for all billing, collections, denials, and payments." Benchmark is further obligated to compensate Quest for Quest's services within thirty days of the date that Quest submits an appropriate invoice. According to the contract, Quest's "right to payment for services shall not be contingent upon the ability of [Benchmark] to collect amounts billed to any applicable payment program or any individual patient." The only exception is that Benchmark will not be required to compensate Quest if a failure to collect a fee or denial of a claim is based upon Quest's own failure to submit a "timely and complete invoice" with appropriate documentation.
*183 ¶ 19. As to termination, the contract provides that either party may terminate for just cause by giving the non-terminating party thirty days written notice.[3] Absent just cause, the only provision for termination is that either party may terminate after the expiration of the initial term of the contract provided that the terminating party gives sixty days' written notice. The initial term was for a period of twelve months.
¶ 20. From our de novo review, we find that the trial court correctly determined that the contract terms are not ambiguous, and parol evidence should not be admitted to alter the terms of the agreement.
¶ 21. Benchmark argues that parol evidence of an alleged contrary extrinsic agreement between Quest and Benchmark regarding billing should have been admitted because Quest "opened the door" to admittance of the evidence during Kuluz's testimony on cross-examination. This argument is disingenuous at best. Any testimony on the issue was purposefully elicited by Benchmark. Benchmark cannot argue that Quest "opened the door." Further, Benchmark identified no testimony the company offered on this subject after the door had allegedly been opened in the course of the cross-examination of Kuluz. We find that this assignment of error is without merit.

IV. WHETHER THE TRIAL COURT ERRED BY DENYING QUEST PREJUDGMENT INTEREST.
¶ 22. On cross-appeal, Quest argues that the trial court erred in denying prejudgment interest. Quest asserts that it clearly showed the amount of specific damages of $79,474.48 since this amount was determinable by looking at the terms of the contract. Benchmark responds that the trial court correctly ruled on the matter denying prejudgment interest. The trial court found that the $130,774.48 jury award was not specific as to what part represented special damages and what part represented lost profits. Because the award was not specific, the court found that the damages were unliquidated, and therefore prejudgment interest was improper. We agree with the trial court.

STANDARD OF REVIEW
¶ 23. The award of prejudgment interest is discretionary with the trial court. Simpson v. State Farm Fire and Cas. Co., 564 So.2d 1374, 1380 (Miss.1990). We review the trial court's ruling on prejudgment interest for abuse of discretion. Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp., 743 So.2d 954, 970-71(¶ 50) (Miss.1999); Preferred Risk Mut. Ins. Co. v. Johnson, 730 So.2d 574, 577(¶ 11) (Miss.1998).

DISCUSSION
¶ 24. Our supreme court generally holds that prejudgment interest may be awarded where the claim is liquidated or where there is a bad faith refusal to pay an amount owed. Warwick v. Matheney, 603 So.2d 330, 342 (Miss.1992). "Damages being `liquidated' refers to damages that are set or determined by a contract when a breach occurs." Moeller v. Am. Guar. and Liab. Ins. Co., 812 So.2d 953, 959-60(¶ 18) (Miss.2002) (citing BLACK'S LAW DICTIONARY 395 (7th ed. 1999)). "Unliquidated" damages are "[d]amages that have been established *184 by a verdict or award but cannot be determined by a fixed formula, so they are left to the discretion of the judge or jury." Id. at 959-60(¶ 18) (quoting BLACK'S LAW DICTIONARY 397).
¶ 25. Our review of the record indicates that the claim here was unliquidated. The total contract price was not set forth in the contract. Although the agreement contained a formula for calculating the cost of work performed, the record reflects a legitimate dispute over how much money was owed under the contract. Benchmark was not required to compensate Quest if a failure to collect a fee or denial of a claim was based on Quest's failure to submit a "timely and complete invoice" with appropriate documentation. Much of the testimony at trial concerned whether Medicare's failure to pay in a more timely manner was due to errors committed by Quest or Benchmark personnel. Benchmark agreed, prior to trial, that it owed Quest payment under the contract in the amount of $30,610.71. Quest rejected this amount and stated the correct amount was $79,474.48. Even after the issue was tried before a jury, the jury verdict was unclear as to how much of the claim for $79,474.48 was included in the award of $130,774.48. The jury may well have reduced the claim for specific damages by a round number, for example, $20,000 for services apparently rendered to a certain private-pay patient mentioned numerous times at trial. Therefore, we find that the trial judge neither erred in finding the damages to be unliquidated nor abused his discretion in denying prejudgment interest.
¶ 26. Concluding that none of the assignments of error on appeal or cross-appeal mandates reversal, we affirm the judgment of the Lauderdale County Circuit Court.
¶ 27. THE JUDGMENT OF THE LAUDERDALE COUNTY CIRCUIT COURT IS AFFIRMED ON BOTH DIRECT AND CROSS-APPEAL. COSTS OF THIS APPEAL ARE TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT/CROSS-APPELLEE AND THE APPELLEE/CROSS-APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] The contract states that Benchmark "is responsible for billing for services, collecting payment from third party payors and/or patient[s], and paying [Quest]. [Benchmark] assumes responsibility for all billing, collections, denials, and payment." This broad language makes Benchmark responsible for most Medicare reimbursement issues. The record indicates that Benchmark's inability to obtain Medicare reimbursement may have been the chief cause of Benchmark's delinquent payments and subsequent termination of the contract. Nonetheless, the uncontradicted evidence at trial reflected that Medicare did eventually reimburse Benchmark in an amount in excess of the amount billed by Quest. William King, the accountant who prepared Benchmark's cost report for the year in question, testified that the amount billed by Benchmark to Medicare was "marked-up" above what Benchmark was billed by Quest. Quest's accountant, Tommy Kuluz, confirmed that Benchmark actually received reimbursement from Medicare in excess of the amount Quest billed to Benchmark.
[2] Contrary to Benchmark's assertion that there was no documentation for Kuluz's estimate, this process was described in a document entitled "Supporting Information for the Equation to Compute Damages of $99,086.37 from Benchmark Health Care" which was admitted at trial as Exhibit 13. Kuluz then discounted this figure by five percent to arrive at a total of $95,000 alleged lost profits.
[3] "Just cause" is defined in the contract as (1) failure to comply with the terms of the contract (2) engaging in conduct which would prevent the non-defaulting party from complying with the terms of the contract or (3) entering voluntary or involuntary liquidation, dissolution, or assignment. None of these grounds were present or even alleged by Benchmark when it terminated the contract.