967 So.2d 654 (2007)
H. Ted CAIN d/b/a Quest Rehab, Appellant/Cross-Appellee,
v.
Brian CAIN and Lakeview Nursing Center, Appellees/Cross-Appellants.
No. 2005-CA-00251-COA.
Court of Appeals of Mississippi.
June 26, 2007.
Rehearing Denied October 30, 2007.
*658 Darren E. Gray, Wiggins, John R. Reeves, attorneys for appellant.
Johnny L. Nelms, J. Henry Ros, Gulfport, attorneys for appellees.
Before MYERS, P.J., CHANDLER and GRIFFIS, JJ.
CHANDLER, J., for the Court.
¶ 1. H. Ted Cain d/b/a Quest Rehab (Quest) sued Brian Cain and Lakeview Nursing Center (Lakeview) for breach of a contract requiring Quest to provide rehabilitation therapy services to Lakeview. After a trial in the Circuit Court of Harrison County, the jury awarded Quest compensatory damages in the amounts of $86,752 for services rendered and $62,500 for lost profits. The trial court ordered Lakeview to pay post-judgment interest.
¶ 2. Quest appeals, arguing that the trial court erred by granting a directed verdict on its claim that Lakeview breached a covenant not to hire Quest's employees during the contract term or for a period of two years after termination of the contract. Quest further argues that the trial court should have awarded pre-judgment interest and attorneys' fees and allowed the issue of punitive damages to go to the jury. Lakeview has cross-appealed, arguing that the trial court erred by allowing Quest's evidence of lost profits to go to the jury.
¶ 3. We affirm in part and reverse and remand in part for the trial court to calculate and award prejudgment interest.

FACTS
¶ 4. Ted Cain and Brian Cain are brothers. Ted Cain owned Quest Rehab, a business providing rehabilitation therapy services. Brian Cain was the president and sole stockholder of Lakeview Nursing Center, a nursing home for the elderly. Quest and Lakeview entered into the contract at issue on March 1, 1998. The contract, titled "Therapy Services Agreement," stated that Quest would furnish rehabilitation services to Lakeview consisting of speech-language pathology, physical therapy, and/or occupational therapy services. The contract made Quest the exclusive agent to *659 furnish these rehabilitative therapies to Lakeview. The contract was signed by Ted Cain on behalf of Quest and Brian Cain on behalf of Lakeview.
¶ 5. The term of the contract was for one year from March 1, 1998, and was automatically renewable for successive one-year periods unless either party, forty-five days prior to the end of the term, gave notice of its intent not to renew the contract. During the initial one-year term, the contract could be terminated "for just cause by giving the other party (the `defaulting party') written notice of termination thirty (30) days prior to the effective date of termination set forth in said notice." After the initial term, either party could terminate the contract with or without cause by giving the other party written notice at least sixty days prior to the effective date of termination.
¶ 6. The contract stated that Lakeview was to pay Quest "on a `fee-for-service' basis for the services identified in Attachment `A.' . . . at the rate(s) indicated and within the time frame identified in Attachment `A.'" The contract provided for Quest to bill Lakeview monthly with invoices reflecting services rendered within the previous month and for Lakeview to remit payment within thirty days from the invoice date. The contract further stated, "Contractor's right to payment for services shall not be contingent upon the ability of [Lakeview] to collect amounts billed to any applicable payment program or any individual patient." Attachment A to the contract provided that Lakeview would pay Quest twenty-eight dollars per unit for speech pathology, twenty-eight dollars per unit for occupational therapy, and would pay under the salary equivalency method for physical therapy. The physical therapy rate included a reduced rate based on the salary equivalency method for licensed physical therapy assistants and aides, and travel rates for physical therapists and licensed physical therapy assistants equal to fifty percent of their rates as calculated under the salary equivalency method. It was established at trial that a "unit" comprised fifteen minutes of billable time. The contract also stated that "the services to be furnished and identified in Attachment `A' may be modified only by written agreement of the parties."
¶ 7. Pursuant to the contract, Quest began providing therapy services to Lakeview on March 1, 1998. Quest billed Lakeview monthly with invoices reflecting the number of units of the different types of therapy services provided, and in April 1998 Lakeview paid Quest's first bill for services rendered in March 1998. Brian Cain testified that Lakeview used funds it was reimbursed by Medicare to pay Quest's bills. Brian testified that, in April 1998, changes went into effect in the Medicare reimbursement rates for speech therapy, occupational therapy and physical therapy. These changes lowered Lakeview's Medicare reimbursement rates for speech and occupational therapy and raised its reimbursement rates for physical therapy. Brian testified that, under the new rates, Lakeview's Medicare reimbursement for speech and occupational therapy would be insufficient to pay Quest the amounts due under the contract.
¶ 8. At the trial, Lakeview sought to show that the contract had been subsequently orally modified to incorporate the new Medicare reimbursement rates. Brian testified that, sometime after the Medicare rate changes went into effect, he spoke with either Ted or with Quest's administrator, Julia Threadgill, about adjusting the amounts payable under the contract to reflect the new rates. Brian related that either Ted or Threadgill orally agreed that Quest would charge Lakeview under the new reimbursement rates. *660 Two invoices from Quest to Lakeview from April 1998 and May 1998 were admitted into evidence reflecting the new reimbursement rates. Brian testified that, in June 1998, he and Ted had an argument subsequent to which Lakeview received revised bills from Quest for April and May 1998 reflecting the higher contract rates. Quest's invoices for June, July, and August also reflected the contract rates. Tommy Kuluz, Quest's chief financial officer, testified that the initial April and May invoices reflecting the lower rates were sent in error and that the revised bills were sent as soon as the error was discovered. Ted Cain testified that he never agreed to modify the contract terms to charge Lakeview according to the new Medicare reimbursement rates.
¶ 9. On August 21, 1998, Lakeview sent Quest a letter terminating the contract effective September 20, 1998, asserting that Quest had failed to abide by an agreement to adjust its billing rates to reflect the new Medicare reimbursement rates. By letter faxed to Quest, Lakeview terminated the contract effective at 12:00 p.m. on August 26, 1998. The next day, Innovative Therapies, another rehabilitation therapy company, began performing rehabilitation therapy services at Lakeview. Brian Cain had a fifty-percent ownership interest in Innovative Therapies.
¶ 10. On November 13, 1998, Ted Cain d/b/a Quest sued Brian Cain and Lakeview for breach of contract, requesting $287,864.90 for services rendered through August 26, 1998 and $126,688.14 in lost profits, plus punitive damages, interest, costs, and attorney's fees. On August 31, 1999, Lakeview tendered a check to Quest in the amount of $188,882.67, the amount it asserted was due if calculated under the new reimbursement rates. Quest accepted the check in partial payment of the amount due under the contract rates. The question before the jury was whether the contract had been modified to incorporate the new rates as asserted by Lakeview such that no further funds were due for services rendered. The jury found that Lakeview had breached the contract and awarded Quest $86,752 for services rendered and $62,500 for lost profits. Both Quest and Lakeview appeal.
I. THE COURT ERRED IN GRANTING A DIRECTED VERDICT ON THE ISSUE OF LAKEVIEW'S BREACH OF CONTRACT CONCERNING THE UTILIZATION OF EMPLOYEES OF H. TED CAIN D/B/A QUEST REHAB.
¶ 11. After both sides rested, the trial court directed a verdict for Lakeview on the issue of Lakeview's breach of a covenant not to hire Quest's employees during the contract or for two years after the termination of the contract. Quest appeals. The trial court's grant of a directed verdict is a question of law which is subject to de novo review. Canadian National/Ill. Cent. R. Co. v. Hall, 953 So.2d 1084, 1090(¶ 9) (Miss.2007). On review of a directed verdict, we consider the evidence in the light most favorable to the non-movant, giving the non-movant the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. "[A] trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." Vu v. Clayton, 765 So.2d 1253, 1254(¶ 5) (Miss.2000) (quoting Vines v. Windham, 606 So.2d 128, 131 (Miss.1992)). To create a jury question, the evidence in opposition of the motion should be "of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment could differ as to the verdict." Murray Env. Corp. v. Atlas Env. Corp., 851 So.2d 426, *661 429(¶ 7) (Miss.Ct.App.2003) (quoting Collins v. Ringwald, 502 So.2d 677, 678 (Miss. 1987)).
¶ 12. The covenant not to hire, under the heading "Personnel Covenant," stated:
Facility recognizes that Contractor's employees are valuable assets of Contractor and agrees that during the term of this Agreement and for a period of two (2) years following the termination of this Agreement it shall not hire, entice to hire, or induce to be hired by any means whatsoever, either directly or indirectly, or enter into any contract or agreement to perform any rehabilitation services utilizing any personnel employed by Contractor.
This clause was a restrictive covenant placing restraints on Lakeview's ability to hire employees. See Landry v. Moody Grishman Agency, Inc., 254 Miss. 363, 374, 181 So.2d 134, 139 (1965). The covenant not to hire also limited the employment opportunities of those employees covered by the contract language. Thus, in this situation two employers have attempted to contractually eliminate the employment opportunities of third persons. This case presents the first occasion that a Mississippi court has considered the propriety of a covenant not to hire.
¶ 13. Regarding a covenant not to compete, our supreme court has stated that restrictive covenants are in restraint of trade and individual freedom and are not favorites of the law, but will be enforced when reasonable. Frierson v. Sheppard Bldg. Supply Co., 247 Miss. 157, 172, 154 So.2d 151, 156 (1963). The power of the court to enforce a restrictive covenant is invoked by the contract and the legal necessity that contracts be honored. Id. "[I]t is the contract the parties themselves made that measures the restriction, both as to scope and time." Id. However, only when a covenant in restraint of trade is reasonable will it be upheld by this Court. Empiregas, Inc. of Kosciusko v. Bain, 599 So.2d 971, 975 (Miss.1992). The employer bears the burden to prove that the restriction is reasonable in light of the economic interest sought to be protected. Thames v. Davis & Goulet, Ins., Inc., 420 So.2d 1041, 1043 (Miss.1982). Covenants in restraint of trade are to be strictly interpreted. Id. (quoting Arthur Murray Dance Studios of Cleveland v. Witter, 105 N.E.2d 685, 693 (1952)). "The validity and therefore, the enforceability of a non-competition provision is largely predicated upon the reasonableness and specificity of its terms, primarily, the duration of the restriction and its geographic scope." Empiregas, 599 So.2d at 975. Non-competition agreements are valid only "within such territory and during such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent." Id. (quoting Wilson v. Gamble, 180 Miss. 499, 510-11, 177 So. 363, 365 (1937)). To determine the validity of a covenant in restraint of trade, we look to the respective rights of the employer, the employee, and the public. Empiregas, 599 So.2d at 975.
¶ 14. The following evidence was presented at the trial concerning Lakeview's breach of the covenant. Ted Cain testified that six Quest employees including licensed physical therapist aides Anthony Bosarge and Scott Keller went to work at Lakeview during the contract term or two years thereafter. He stated that rehabilitative therapists were in short supply in the labor market and thus were valuable to Quest. Ted stated he learned Brian Cain had hired Quest's employees, that he told Brian the hiring breached the contract, and that Brian responded that he was going to hire them anyway. Brian Cain testified that the Quest employees were *662 not hired by Lakeview but by Innovative Therapies, a company Brian owned in partnership with Larry Jones. Brian opined at trial that the hiring did not breach the contract because Innovative, not Lakeview, had hired the Quest employees. Brian testified that he was not involved in the hiring and firing of Innovative employees.
¶ 15. On August 27, 1998, the day after Lakeview terminated the contract, Lakeview contracted with Innovative to supply the rehabilitation therapy services formerly supplied by Quest. Pursuant to this contract, the Quest employees hired by Innovative resumed work at Lakeview. Two of the former Quest employees hired by Innovative testified on behalf of Lakeview. Bosarge testified that Quest fired him in August 1998 and he contacted Jones about working for Innovative. Innovative hired Bosarge. Innovative initially assigned Bosarge to another nursing home and several months later, to Lakeview. Keller testified that he left Quest in June 1998 and contacted Jones about working for Innovative. Innovative hired Keller, assigning him to several facilities. Innovative sent Keller to Lakeview in September or October 1998. Both Bosarge and Keller stated that they never talked to Brian Cain about employment with Innovative prior to being hired by Innovative.
¶ 16. Lakeview argues that there could be no breach of contract because Innovative, not Lakeview, hired the Quest employees. Quest contends that the contract covers the hiring of Bosarge and Keller and that Innovative was acting as Lakeview's agent when it hired the Quest employees. We address Quest's agency argument. As the administrator and sole stockholder of Lakeview and a fifty-percent partner in Innovative, Brian Cain was an agent for both Lakeview and Innovative. There was testimony from Ted Cain that he visited Brian at his Lakeview office and discussed the hiring of Quest employees. Ted stated that he told Brian his hiring of Quest employees was a breach of the contract and Brian responded that he was going to hire the Quest employees anyway. Brian stated that this argument occurred in June 1998, but denied that he was involved in any hiring decisions at Innovative. Ted's testimony presents a fact question as to whether or not Brian, on behalf of Lakeview, used Innovative to hire Quest employees to work at Lakeview.
¶ 17. The contract stated that, for a specified period of time, Lakeview was not to hire, entice to hire, or induce to hire Quest's employees "by any means whatsoever, either directly or indirectly." Certainly, there was no evidence that Lakeview directly hired Quest employees. The question is whether the evidence was sufficient to enable a jury to find that Lakeview indirectly hired the employees. From the evidence presented, a jury reasonably could find that Brian directed Innovative's hiring of Quest employees, did so on behalf of Lakeview, and that his conduct breached the covenant barring Lakeview from indirectly or by any means whatsoever hiring, inducing to hire, or enticing to hire Quest's employees. However, our inquiry does not end here.
¶ 18. We must address Lakeview's argument that the covenant was ambiguous as to which Quest employees were subject to the restriction. In determining the meaning of contract terms, this Court reads the contract as a whole, gives contract terms their plain meaning, and construes any ambiguities against the drafter. Pursue Energy Corp. v. Perkins, 558 So.2d 349, 352-53 (Miss.1990). This Court must give effect to all contract terms if that can reasonably be done. Id. But if contract language is susceptible of *663 two or more reasonable interpretations, then ambiguity is present. Miss. Farm Bureau Cas. Ins. v. Britt, 826 So.2d 1261, 1265(¶ 14) (Miss.2002). Lakeview points out that the covenant only stated that Quest's "employees are valuable assets" and, later, referred to the covered employees as "personnel employed by [Quest]." These terms were ambiguous because it is impossible to discern if they embraced all past, present, or future Quest employees, or only persons who were employed by Quest at the inception of the contract, or persons employed by Quest any time during the term of the contract. It is impossible to determine, for example, whether Bosarge and Keller were embraced by the contract language because they were no longer Quest employees at the time they were hired by Innovative. Moreover, in the absence of specificity as to which individuals were limited by the covenant not to hire, the covenant operates as an unreasonable restraint on trade. Empiregas, 599 So.2d at 975. As we have found the contract to be ambiguous, we leave for another day the question of whether a more specific covenant not to hire would be valid and enforceable. We affirm the trial court's grant of a directed verdict as to this issue.
II. THE COURT ERRED IN DENYING H. TED CAIN D/B/A QUEST REHAB PREJUDGMENT INTEREST.
¶ 19. The trial court denied Quest's request for prejudgment interest on the $86,752 which the jury awarded for services rendered. Quest did not seek prejudgment interest on the amount awarded for lost profits. In Mississippi, the trial judge possesses the authority to award prejudgment interest to the prevailing party in a breach of contract suit if prejudgment interest was requested in the complaint. Warwick v. Matheney, 603 So.2d 330, 342 (Miss.1992). The decision to award prejudgment interest rests within the trial judge's discretion. Id. In general, if prejudgment interest is awarded, it dates from the breach of the contract. Estate of Baxter v. Shaw Assoc., Inc., 797 So.2d 396, 403(¶ 30) (Miss.Ct.App.2001). The court may award prejudgment interest when damages are liquidated when the claim is originally made or when there has been a bad faith denial of payment. Preferred Risk Mut. Ins. Co. v. Johnson, 730 So.2d 574, 577(¶ 12) (Miss.1998). The purpose of awarding prejudgment interest is not to punish the wrongdoer but to compensate the innocent party for the detention of the overdue funds. Sunburst Bank v. Keith, 648 So.2d 1147, 1153 (Miss.1995).
¶ 20. Quest requested prejudgment interest in its complaint. The trial court denied the request upon a finding that the damages for services rendered were disputed by Lakeview's argument that the contract had been modified and that nothing was owed. Quest argues that the trial court abused its discretion by denying prejudgment interest because the $86,752 in damages for services rendered were liquidated and payable from the date of the breach. Lakeview contends that the damages were not liquidated. Lakeview points out that at trial Quest sought $94,827.64 for services rendered, over eight thousand dollars more than the jury awarded. Lakeview also argues that the amount due for services rendered was placed in dispute by the testimony of Brian Cain and others that Quest had provided unnecessary therapy services to Lakeview and had thereby overbilled Lakeview. No evidence of specific instances of overbilling was admitted.
¶ 21. In determining whether a claim is liquidated, "interest has been denied where `there is a bona fide dispute as *664 to the amount of damages as well as the responsibility for the liability therefore.'" Thompson Mach. Commerce Corp. v. Wallace, 687 So.2d 149, 152 (Miss.1997). Liquidated damages are those which are set or determined by the contract when the breach occurred; unliquidated damages are those which have been "established by a verdict or award but cannot be determined by a fixed formula, so they are left to the discretion of the judge or jury." Moeller v. Am. Guarantee and Liability Ins. Co., 812 So.2d 953, 959-60(¶ 18) (Miss. 2002) (quoting Black's Law Dictionary 397 (7th ed.1999)). In asserting that the $86,752 was a liquidated amount, Quest argues that $86,752 was the amount reflected by its bills for April 1998 through August 1998, less the $188,882.67 already paid by Lakeview. Quest points out that Brian Cain admitted that Quest's bills correctly reflected the contract rates and that if no modification of the contract was found to have occurred, the amount billed was the amount due.
¶ 22. We agree with Quest's argument that the $86,752 was a liquidated amount. At the trial, Quest indeed requested $94,827.64 in damages for services rendered. An itemized "Statement of Account," dated September 30, 1998, reflects that the $94,827.64 comprised the sum of the unpaid amounts reflected by the April 1998 through August 1998 invoices plus finance charges. In awarding $86,752, the jury awarded the billed amount and subtracted the finance charges. We must determine if this calculation rendered the damages unliquidated. We conclude that in this situation it did not. Brian Cain admitted that the outstanding amount shown by the bills reflected the contract rates. Lakeview never disputed the finance charges. Its evidence of overbilling was scant and directed at proving that Quest failed to perform its obligations under the contract, justifying Lakeview's termination. Its primary argument was that the contract had been modified to the lower rates and nothing further was due. Thus, the amount due as of the date of the breach was never placed in dispute. The jury awarded the outstanding amount reflected by the bills which Lakeview admitted was due under the contract. The contract did not provide for finance charges and the propriety of finance charges under the contract was not placed in dispute by the parties. The $86,752 was the amount undisputedly owed under the contract rates. Therefore, the damages for services rendered were liquidated.
¶ 23. The trial court denied prejudgment interest because it found that damages were placed in dispute by Lakeview's argument that the contract had been modified. This ruling was erroneous and an abuse of discretion. Interest may be awarded when the amount of damages is certain, even if the fact of liability for those damages is disputed. Estate of Baxter, 797 So.2d at 403(¶ 32). That was precisely the situation in the instant case. The parties disputed whether the contract had been modified and thus whether any damages were owed at all. There was no dispute as to the amount of damages at stake. As we have held, the amount of damages at stake was liquidated and fixed as of the date of the breach of contract. Therefore, the trial court erred by denying prejudgment interest. We reverse and remand for the trial court to calculate and award prejudgment interest to Quest.
III. THE COURT ERRED IN DENYING H. TED CAIN D/B/A QUEST REHAB ATTORNEY'S FEES AS PROVIDED FOR BY CONTRACT AND PURSUANT TO RULE 11(B) OF THE MISSISSIPPI RULES OF CIVIL PROCEDURE.
¶ 24. Quest requested attorney's fees, contending that the contract provided for *665 them or that it was entitled to attorney's fees pursuant to Mississippi Rule of Civil Procedure 11(b) and the Litigation Accountability Act. The trial court declined to award attorney's fees. Quest renews both its arguments on attorney's fees on appeal.
A. The contract language
¶ 25. Attorney's fees are recoverable if allowed in a contract. Jackson Cty. Sch. Bd. v. Osborn, 605 So.2d 731, 735 (Miss.1992). Absent statutory or contractual provisions, attorney's fees are not recoverable unless punitive damages are also proper. Miss. Power Co. v. Hanson, 905 So.2d 547, 552(¶ 23) (Miss.2005). Quest argues that the parties contractually bargained for the breaching party to pay attorney's fees in the event of a contract breach with the following language:
[Lakeview] and [Quest] agree to indemnify, hold harmless and defend each other, from and against all losses, claims, suits, damages, actions, causes of action, proceedings, demands, assessments, settlements, judgements, costs, expenses, or other liabilities of any kind or nature imposed on or asserted against the indemnified party as a result of, arising out of or relating to the indemnifying party's negligent or willful acts or omissions in the performance of services under this Agreement.
This language appeared under the heading "Insurance and Indemnification."
¶ 26. The trial court ruled that the indemnity provision clearly did not encompass attorney's fees. Lakeview argues that the language functioned solely as an indemnity agreement pursuant to which the parties would indemnify each other against any actions by independent third parties. Lakeview argues that the language did not authorize an award of attorney's fees for disputes between Lakeview and Quest. Quest avers that the language tracked that in Turner v. Terry, 799 So.2d 25 (Miss.2001). In Turner, the supreme court found the following language in a pledge and security agreement provided for attorney's fees:
Section 10. Indemnity and Expenses
(A) The Pledgor agrees to indemnify Turner from and against any and all claim, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except claims, losses or liabilities resulting solely and directly from Turner's gross negligence or willful misconduct.
(B) The Pledgor will upon demand pay to Turner the amount of any and all cost and expenses, including the . . . disbursements of Turner's counsel and of any experts and agents, which Turner may incur in connection with (i) the administration of the Agreement; (ii) the custody preservation, use or operation of, or the sale of, or enforcement of any of the rights of Turner hereunder; (iv) the failure by the Pledgor to perform any of the provisions hereof, except expenses resulting solely and directly from Turner's gross negligence or willful misconduct.
Id. at 38 (¶¶ 44, 46). Quest contends that the indemnity provision's language is sufficiently similar to that in Turner to enable this Court to find that it encompasses attorney's fees.
¶ 27. When determining the meaning of contract language, we interpret the contract objectively and determine the parties' intent from "`the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.'" Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss.1987) (quoting Hunt v. Triplex Safety Glass Co., 60 F.2d 92, 94 (6th Cir.1932)). When the contract is unambiguous, its terms are to *666 be given their plain meaning. Ferrara v. Walters, 919 So.2d 876, 882(¶ 13) (Miss. 2005). Ambiguous contracts are to be construed against the drafter. Rotenberry v. Hooker, 864 So.2d 266, 270(¶ 14) (Miss. 2003). Contrary to Quest's argument, it was substantially clearer in Turner than in this case that the contract provision entitled the non-breaching party to attorney's fees. In Turner, the pledgor promised "upon demand pay to Turner the amount of any and all cost and expenses, including the . . . disbursements of Turner's counsel . . ., which Turner may incur in connection with . . . enforcement of any of the rights of Turner hereunder." The contract plainly provided for attorney's fees.
¶ 28. After carefully reviewing the contract language in this case, we find that it cannot support the conclusion that the parties agreed Lakeview would pay Quest's attorney's fees if Lakeview breached the contract. Quest asserts that attorney's fees were permitted by the indemnity provision in which Lakeview promised to "indemnify . . . [Quest] from and against all losses, . . . costs, expenses or other liabilities of any kind or nature imposed on . . . [Quest] as a result of, arising out of, or relating to [Lakeview's] . . . willful acts or omissions in the performance of services under [the contract]." Quest asserts that Lakeview's breach of contract by failing to pay for services rendered constituted "willful acts or omissions in the performance of services under the contract" and that the attorney's fees were costs, expenses, or liabilities imposed on Quest as the result of Lakeview's breach of contract. It may be said that the attorney's fees were costs, expenses, or liabilities imposed on Quest as a result of Lakeview's breach of contract. But the contract provides for each party to indemnify the other for losses resulting from the indemnifying party's "willful acts or omissions in the performance of services under [the contract]." The language created a coequal obligation. We search for the meaning of "performance of services under [the contract]." The contract provided for Quest to perform services for Lakeview in the form of patient therapy. Lakeview was not performing services for Quest but it was performing services for its patients through Quest. Lakeview's duty under the contract was to timely pay Quest for the patient services rendered and that was the duty Lakeview breached. Because those were the parties' corresponding obligations, and Lakeview had no contractual duty to provide services to Quest, the plain language of the indemnity agreement appears to be limited to the parties' performance of patient services. It is only with that meaning that indemnity for "performance of services under the contract" makes any sense as applied coequally to both parties. Lakeview's contractual obligation to pay Quest was not a performance of services under the contract. Therefore, the indemnity provision did not encompass attorney's fees for Lakeview's breach of the contract by failing to pay Quest.
B. Rule 11(b) and the Litigation Accountability Act
¶ 29. Quest Rehab filed an amended complaint on August 21, 2003. Lakeview filed an answer and counterclaim asserting that Quest's action against Lakeview was malicious, baseless, and frivolous, entitling Lakeview to sanctions pursuant to Mississippi Rule of Civil Procedure 11(b) and the Litigation Accountability Act (LAA). After both parties rested their cases, the court permitted Lakeview to voluntarily withdraw the counterclaim. Quest argued that it was entitled to attorney's fees for defending the counterclaim under Rule 11(b) and the Litigation Accountability Act because Lakeview's withdrawal shows the counterclaim was interposed for delay or harassment and Lakeview expanded the proceedings unnecessarily. The trial court *667 denied Quest's request, and Quest appeals. Lakeview avers that it withdrew the counterclaim because the trial court would not consider the evidence that supported the claim.
¶ 30. At trial, a party may secure a dismissal of a claim only upon order of the court and upon such terms and conditions as the court deems proper. M.R.C.P. 41(a)(2). The terms and conditions attendant to the dismissal are discretionary with the trial court and may include awarding attorney's fees as protection for the unwitting litigant. Bellsouth Pers. Commc'n, LLC v. Bd. of Supervisors of Hinds Cty., 912 So.2d 436, 443-44(¶ 26) (Miss.2006). Quest does not argue that the trial court abused its discretion by failing to award Quest attorney's fees as compensation for the cost of defending the counterclaim pursuant to Rule 41(a)(2). Rather, Quest contends that it was entitled to attorney's fees pursuant to Rule 11(b) and the LAA because Lakeview's counterclaim was frivolous.
¶ 31. The LAA provides:
(1) Except as otherwise provided in this chapter, in any civil action commenced or appealed in any court of record in this state, the court shall award, as part of its judgment and in addition to any other costs otherwise assessed, reasonable attorneys fees and costs against any party or attorney if the court, upon the motion of any party or on its own motion, finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct including, but not limited to, abuse of discovery procedures available under the Mississippi Rules of Civil Procedure.
Miss.Code Ann. § 11-55-5(1) (Rev.2002). A claim is without substantial justification when it is frivolous, groundless in fact or law, or vexatious. Miss.Code Ann. 11-55-3(a) (Rev.2002). In determining whether a claim is frivolous, we look to the Rule 11 definition of "frivolous." Wilson v. Greyhound Bus Lines, 830 So.2d 1151, 1159(¶ 21) (Miss.2002) (quoting Scruggs v. Saterfiel, 693 So.2d 924, 927 (Miss.1997)). Under Rule 11, a claim is frivolous "only when, objectively speaking, the pleader or movant has no hope of success." Id. "Though a case may be weak or `light-headed,' that is not sufficient to label it frivolous." Id. The fact that an argument is wrong or untimely does not necessarily render the argument frivolous. Miss. Dept. of Human Servs. v. Shelby, 802 So.2d 89, 97(¶ 33) (Miss.2001). We review the trial court's decision not to award sanctions under Rule 11 or the LAA for abuse of discretion.
¶ 32. Lakeview contends that with the counterclaim it planned to show that on another occasion Ted Cain had entered into a written contract with a nursing home and had orally modified the contract, then sued the nursing home asserting the written contract. The trial court refused to hear Lakeview's discussion of Quest's contract with the other nursing home and Lakeview voluntarily withdrew the counterclaim. While Lakeview's Rule 11 claim was weak, we cannot say that, objectively speaking, Lakeview had no hope of success such that the trial court's denial of sanctions was an abuse of discretion. This issue is without merit.
IV. THE COURT ERRED BY GRANTING A DIRECTED VERDICT DENYING H. TED CAIN D/B/A QUEST REHAB PUNITIVE DAMAGES.
¶ 33. Quest contends it is entitled to punitive damages because Lakeview *668 tortiously breached the contract by terminating Quest's services without the requisite notice and without just cause. For entitlement to punitive damages in a breach of contract case, the plaintiff must show by a preponderance of the evidence that the breach was the result of an intentional wrong or that the defendant acted maliciously or with reckless disregard of the rights of the plaintiff. Hamilton v. Hopkins, 834 So.2d 695, 703(¶ 26) (Miss. 2003). The breach must rise to the level of an independent tort. Id. at 704(¶ 27). The fact that the defendant willingly chose not to complete the contract is insufficient to warrant punitive damages. Id. There is nothing about this case to indicate Lakeview acted maliciously or with reckless disregard for Quest's rights such that the breach rose to the level of an independent tort. This was an ordinary breach of contract case for which punitive damages are inappropriate.

ISSUE ON CROSS-APPEAL
I. QUEST REHAB'S EVIDENCE FOR ALLEGED LOST PROFITS WAS NOT SUFFICIENT UNDER MISSISSIPPI LAW.
¶ 34. On cross-appeal, Lakeview argues that the trial court erred by admitting Quest's evidence of lost profits, which consisted of the testimony of its accountant and chief financial officer, Tommy Kuluz. Kuluz prepared a statement estimating Quest's lost future profits from August 27, 1998, through February 28, 1999, the time remaining in the contract term subsequent to Lakeview's breach. Kuluz estimated that Quest's future profits would have been $126,688.14. In projecting this figure, Kuluz testified that he selected invoices from April, May, and June, three months in the middle of the contract that did not include the highest or lowest invoices. He averaged the amounts billed by these invoices, deducted the costs of the therapist salaries and overhead, and arrived at the lost profits figure of $126,688.14. The jury awarded less than half that amount, $62,500.
¶ 35. We review the trial court's admission of evidence for abuse of discretion. Thompson Mach. Commerce Corp., 687 So.2d at 152. We will not reverse the admission of evidence unless the error adversely affected a substantial right of a party. M.R.E. 103(a). A party seeking to recover for lost profits in a breach of contract case must establish the claim with reasonable certainty. Ishee v. Peoples Bank, 737 So.2d 1011, 1013(¶ 8) (Miss. Ct.App.1998). "The unique nature of each contract leaves claims for lost profits to be determined on a case by case basis, as there are no concrete elements of such a claim aside from their establishment to a reasonable certainty." Id. However, a party cannot recover for lost profits if the award is based upon mere speculation and conjecture. Lovett v. E.L. Garner, Inc., 511 So.2d 1346, 1353 (Miss.1987). Damages are speculative only when the cause is uncertain, not when the amount is uncertain. Parker Tractor & Implement Co. v. Johnson, 819 So.2d 1234, 1239(¶ 24) (Miss. 2002). "Where it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery or prevent a jury decision awarding damages." Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss.1984). When loss has occurred but "the extent of the injury and the amount of damage are not capable of exact and accurate proof," damages may be awarded if the evidence lays "a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage." Id. This Court has recognized the use of past earnings to estimate lost profits. Ishee, 737 So.2d at 1013(¶ 9) (citing *669 Kaiser Inv., Inc. v. Linn Agriprises, Inc., 538 So.2d 409, 416 (Miss.1989); Sanders v. Dantzler, 375 So.2d 774, 777 (Miss.1979)).
¶ 36. Lakeview argues that Kuluz's calculation of lost profits was based upon speculation and conjecture and should not have been admitted into evidence. Lakeview points out that Kuluz admitted that there was some speculation inherent in his estimation of lost profits and that his calculations were not based upon generally accepted accounting principles. Lakeview also argues that the amount of therapy Quest performed at Lakeview could have changed during the contract based upon a decrease in the number of patients at Lakeview or variances in patient needs. For these reasons, Lakeview's expert accounting witness opined that an estimation of Quest's future profits would be impossible to make.
¶ 37. In this case, only the amount of damages for lost future profits was uncertain, not the fact that those damages had resulted. We find that Kuluz's testimony laid a sufficient foundation to enable the jury to reach a fair and reasonable estimation of damages for lost profits. In Benchmark Health Care Center, Inc. v. Cain, 912 So.2d 175, 179-81 (¶¶ 8-11) (Miss.Ct. App.2005), this Court adjudicated the issue of damages for lost profits concerning Quest's therapy services contract with Benchmark Health Care Center. The jury had found Benchmark breached the contract and awarded damages for lost profits. Id. at 178(¶ 5). The therapy services contract at issue was similar or identical to the one sub judice. Id. at 177-78(¶ 2). Kuluz testified and used the same method he used in this case in order to calculate Quest's lost future profits, except that he used two, not three, months of prior invoices. Id. at 180(¶ 10). In finding that Kuluz's testimony proved damages to a reasonable certainty, we stated:
We find that the evidence presented by Quest regarding lost profits was not purely speculative. On cross-examination, counsel for Benchmark repeatedly questioned Kuluz whether his estimation of lost profits involved some amount of speculation. Kuluz understandably replied that his estimate did involve a certain amount of speculation, but that the report he prepared was based upon the specific evidence of two previous months of Quest's operations with Benchmark. This being the case, we find that the testimony of Kuluz and the report he prepared reflected a fair and reasonable estimate of Quest's projected lost profits. While some amount of speculation was necessarily involved in a computation of lost profits that had never actually been realized, Kuluz's report and testimony were projected from actual profits realized. . . . Extrapolating actual past profits to reach a figure that represented anticipated future profits was a reasonably certain method of proving lost profits. . . . Some measure of speculation must be involved in an attempt to compute unrealized profits.
Id. at 180(¶ 9).
¶ 38. The Benchmark case is squarely on point with the case sub judice. We find that Quest proved its damages for lost profits to a reasonable certainty and the trial court did not abuse its discretion in allowing Kuluz's testimony on lost profits. This issue is without merit.
¶ 39. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION AND AFFIRMED ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO THE APPELLANT/CROSS-APPELLEE AND *670 ONE HALF TO THE APPELLEES/CROSS-APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. ROBERTS AND CARLTON, JJ., CONCUR IN RESULT ONLY.