BARNES, J.,
 

 for the Court.
 

 ¶ 1. In this appeal we are called upon to determine if the chancellor was correct when he interpreted the language in a lease/option to purchase contract in favor of the lessees John Stuart Moore and Karen J. Moore (collectively, the Moores). The appellants, Michael S. Henry, James N. Henry, William Henry, Larry H. Henry, and David N. Henry (collectively, the Henrys), are the nephews of the lessor, George F. Henry, Jr. (George). The Hen-rys argue that ambiguous language in the lease/purchase contract regarding maintenance of certain structures on the property should be constructed in their favor, thus voiding the agreement with the Moores and allowing a quitclaim deed to the property to them from their uncle to become effective. The Moores filed suit for specific performance of the lease/purchase contract and to cancel the quitclaim deed to the Henrys as a cloud upon the Moores’ title. The chancellor interpreted the contract in favor of the Moores. He ordered specific performance requiring title to the property to be conveyed to the Moores in exchange for their payment of the $15,000 contract purchase price to the Henrys. From this decision, the Henrys appeal.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. John Moore, a Starkville attorney, sought to buy some land in the Bradley community in the western part of Oktib-beha County. After researching the land records, he found that George Henry of Cookeville, Tennessee was the owner of an eighty-acre plot of land in the area where Moore wanted to buy. In January 1989, Moore wrote George about a possible purchaser of George’s Mississippi property. George responded that Moore had not supplied him with the name of the potential purchaser and that he did not want to sell the whole tree farm, but only a strip off the west side, “not even half the acreage.” George addressed the correspondence to “Cousin Stuart” as the two were distantly related. In October 1989, Moore decided he was interested in the land and called George about it. As it turned out, George was also a lawyer, but of advanced years.
 
 [1]
 
 Moore testified that the two agreed to a ten-year lease of the land with an option to buy the land for $15,000 at the end of the term. The agreed lease price was $4 an acre for a total of $320 per year. Moore testified that $4 an acre was the “going rate” at the time for a hunting lease. The
 
 *1149
 
 two also agreed that Moore would pay George’s property tax on the leased property each year. Moore said that George told him that he (George) would prepare a proposal on “what he would be willing to do on the rest of the terms and send it to me, which he did.” Moore and his wife signed the document changing only Moore’s name, which George had typed as “John Paul Moore” who was Moore’s father. In its place he wrote his name “John Stuart Moore” and returned it to George for his and his wife’s signatures. Moore also sent the first payment of $320 with the document. George returned the executed document to Moore who recorded it on November 15, 1990, in the Oktibbeha County Chancery Clerk’s office. Moore testified that prior to the agreement he had never been on the land.
 

 ¶ 3. The agreement, styled “LAND LEASE FOR HUNTING, FISHING & RENTALS ALONG WITH AN OPTION TO PURCHASE,” read as follows:
 

 For and in consideration of the price of Four Dollars per acre, a total of 80 acres totaling $320.00 per year;
 
 and the Vendees assuming the responsibility of one (1) log cabin, one (1) law office, and one (1) bam lying on the herein after described land-,
 
 we the undersigned Vendors do hereby and by these evidences lease the following described land situation in Bradley, Oktibbeha County, Mississippi to wit:
 

 [A legal description of the 80 acres] to attorney, John Stuart Moore, and wife, Karen J. Moore.
 

 This lease of the land, tenements, and hereditaments of the above described land is restricted as follows:
 

 1. Vendees have full hunting and. fishing rights thereon.
 

 2. Vendees have full use of the natural resources of said land to make improvements thereon to grow and market, or use for their personal benefits any game, fish, or domestic stock. They can sell no timber or trees to the open market.
 

 3. Vendees shall pay advalorem taxes on said land for the duration of the lease.
 

 4. Growing and standing timber and all mineral rights shall remain as the property of the Vendors.
 

 5. John Stuart Moore and wife, Karen J. Moore, are here granted an option to purchase said land via a warranty deed on or after October 1, 1999 at a price of Fifteen thousand and no/100 dollars ($15,000.00). (Tax assessor’s true value of said tract of land was $14, 904.00 on vendor’s tax receipt for 1988 advalorem taxes); and vendors here agree that they will sell said property to no other entity or persons before October 1,1999.
 

 6. This contract shall be [ejnforceable against vendors’ executor or administrator of their respective estates and all rights hereunder extend to the legal heirs of the vendees under the Descent and Distribution Laws of the State of Mississippi, of the United States of America.
 

 This document is made in duplicate, each deemed to be an original.
 

 This the 1st Day of October, 1989.
 

 (Emphasis added.)
 

 ¶ 4. The relationship between the Moores and George was uneventful from November 1990 to 1996, with Moore paying his annual rental fee of $320 and the ad valorem taxes on the property. In the summer of 1996, Moore was called by Michael Henry of Greenville, one of George’s nephews, telling Moore that he was handling a timber sale on the land for his uncle. He also told Moore that he and his other brothers, James, William, Larry, and
 
 *1150
 
 David Henry, wanted to buy Moore’s option on the property or trade Moore some land they owned. Moore did not agree to either offer and testified that Michael told him “they were going to get that land, and if I didn’t do one or the other, I wasn’t going to get anything.” Michael’s brother, David, testified that he was on the other line during this telephone call and that Michael did not make such a statement. After the timber was cut, Moore received a letter from George on June 11, 1997, dealing with another tax matter but which ended by saying that he was still bedridden with a spinal cord injury and had large expenses which the timber sale helped to pay. Moore testified that he responded by letter on June 17, 1997, offering to pay the $15,000 option price early to assist George with his expenses. Three months later, by a letter dated September 30, 1997, George wrote Moore a letter revoking the lease and option. George stated in the letter that the reason for the revocation was, “The lease stated that you assumed the responsibility of one log cabin, one law office, and one barn lying on the described land of the lease.” George related that he had received five photographs of his law office on the property which showed that the door was unlocked and wide open. “The pictures taken inside the law office showed a big hole in the roof and it ha[d] completely collapsed.” George said his law books had been damaged from rain and moisture and his filing cabinet was opened and folders were damp. George said he was unable to tell the condition of the cabin as it was locked. He concluded the letter by stating that he hoped Moore would send him a release from the lease/purchase contract, and if he did not, he would hire a Mississippi attorney to gain a release. Moore did not give a release, and George hired Greenville attorney Ernest Lane III to represent him in the matter.
 

 ¶ 5. Moore did not agree to end the agreement and continued to make the monthly payments, which were returned to him by George’s attorney Lane. Moore called George to try to straighten out the problem but talked to his wife who told him that George’s nephew, Michael, was handling the matter. Moore did not try to call Michael. Moore prepared a check for $15,000 to purchase the land, but he testified that he did not try to give it to George because both George and his attorney had told him that “the deal was off.”
 

 ¶ 6. On February 2, 2000, George and his wife filed a quitclaim deed with the Okitibbeha County Chancery Clerk, conveying the property to his nephews, James N., William S., Larry H., David M., and Michael S. Henry, as tenants in common.
 

 ¶ 7. On May 18, 2000, Moore and his wife filed a complaint against George, his wife, and the five Henry nephews seeking specific performance of the contract he had with George and an order to convey the property to the Moores and to remove as a cloud on his title the quitclaim deed from George to his nephews, as well as alleging tortious interference with the performance of a contract.
 

 ¶ 8. Because Moore was a practicing attorney in the Fourteenth Chancery Court District, the three chancellors of that district recused themselves and requested the appointment of a special chancellor pursuant to Mississippi Code Annotated section 9-1-105 (Rev.2002). By order of the Mississippi Supreme Court dated November 13, 2002, attorney Michael Malski of Amo-ry was appointed as the special chancellor to hear the action.
 

 ¶ 9. On the day of trial, November 15, 2002, the parties entered into a stipulation which stated that the sole issue to be resolved by the court was the meaning of the language in the contract which states,
 
 *1151
 
 “For and in consideration of ... and the Vendees assuming the responsibility of one (1) log cabin, one (1) law office, and one (1) barn.... ” The Moores contended that the provision meant that George did not want to be responsible for repairing and maintaining the structures; thus, the fact that the structures were in disrepair was of no effect. The Henrys contended that the provision meant that the Moores were to maintain and repair the structures as part of the agreement with George and that the deterioration of the structures was a material breach that voided the contract.
 

 ¶ 10. At the trial, three of the Henry nephews — James, David, and William— testified. Michael, who had been a major actor in the proceedings, was not able to testify due to serious medical problems. Their testimony centered upon the condition of the land, the meaning of the land to the family, and the conditions of the three structures on the property.
 

 ¶ 11. David testified that when he visited the property in September 1997, the roof of the law office had caved in and the law books George had promised David’s son were ruined. David took photographs of what he found and gave them to his brothers, who sent them to George. David said that George was very upset by what the pictures showed. David said that over the years, the Henry family would visit the land on Memorial Day and walk to the law office. James testified that he lived near the land between 1989 and 1992 and rode horses on it and would take visitors to see the law office. He said that the condition of the law office in 1992 was very good; by that he meant there was an intact door on the law office which was locked, and the office contained windows. He said he saw no roof or water damage at that time. Both nephews testified that there were family portraits of their ancestors on the walls of the law office. William testified that after he married in May 1995, he took his new wife to the property to show her the “neat place” where he visited as a child, and he said they walked the property and went inside the law office and found it to be in good condition.
 

 ¶ 12. Moore called only one witness other than himself, Dr. Terry Lee Ambur-gey, who was a professor at Mississippi State University. Dr. Amburgey was an expert in wood deterioration; he was called to testify about the damage he observed at the property. He visited the property on March 23, 2002, and took photographs of the law office. It was Dr. Amburgey’s opinion that the decay to the building had been ongoing for at least two decades. Moore testified that after the agreement, but prior to receiving the contract from George, he went on the property for the first time in September 1989. Moore testified that the three structures on the property were an old log cabin with a tin roof that had a chain and a lock on it, which he never entered; an old barn with a tin top, which he also said was locked up and did not enter; and the law office. He said the law office was a twelve by twelve or twelve by fourteen one-room structure. Moore said the law office was rotted, and the shingles had some “green stuff’ growing on them. When he looked inside he saw water stains on the ceiling, the books had mildew on them, and the metal file cabinet had rusted. He described the law office as “dilapidated.”
 

 ¶ 13. After the one-day hearing, with testimony from five witnesses and the entry of fifteen exhibits, the court issued a memorandum opinion filed on December 16, 2002, determining the meaning of the contract language. The special chancellor ruled that the drafter of the contract, George, was trying to relieve himself of further responsibility for the repairs of the structures without placing any further re
 
 *1152
 
 striction on the Moores. “In other words, the drafter did not want to be burdened with repair issues concerning the three structures. The drafter’s intent was that the Moores would purchase the property.” The chancellor noted that the drafter, George, was an attorney, and if he had wanted the Moores to maintain the three structures in a desirable condition, it would have been “a simple matter” for George to have included clear language in the agreement to obligate the Moores to do so. “Rather, [George] chose to have the Moores provide for the structures in an abstract manner, thereby relieving himself of further responsibility for the structures.” The court also noted that George used the term “vendees” to designate the Moores in the contract, a term which is used to describe a purchaser of real estate. The special chancellor concluded that his interpretation of the contract was that “the Moores were to have responsibility for the buildings. If they chose to repair them, they could. If they chose not to repair them, they did not have to. George F. Henry no longer had any responsibility with regard to the buildings on the land he intended to sell to the Moores.”
 

 ¶ 14. Some questions arose after the entry of the memorandum opinion, and the special chancellor made additional findings. On August 31, 2004, Special Judge Malski entered a final judgment in which he incorporated his earlier finding that the language in the contract meant that George was trying to free himself from any obligation to repair the three structures, and he ordered the Moores to tender a check in the amount of $15,000 to the Henrys. In return, the Henrys were to deliver a quitclaim deed to the property to the Moores. After losing their case, the Hen-rys retained new counsel, who moved for additional findings of fact and conclusions of law. He also moved for a motion to amend or alter the judgment or, in the alternative, for a new trial. Both motions were denied. The Henrys now appeal the August 2004 judgment.
 

 STANDARD OF REVIEW
 

 ¶ 15. This Court has a limited standard of review when examining a chancellor’s findings on appeal.
 
 McNeil v. Hester,
 
 753 So.2d 1057, 1063(¶21) (Miss. 2000). The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard.
 
 Id.
 
 Therefore, we will not disturb the chancellor’s conclusions when supported by substantial evidence.
 
 Murphy v. Murphy,
 
 631 So.2d 812, 815 (Miss.1994). Questions concerning construction of contracts are questions of law.
 
 Parkerson v. Smith,
 
 817 So.2d 529, 532(117) (Miss.2002). The standard of review for questions of law is de novo.
 
 Id.
 

 ANALYSIS
 

 1. Whether the chancellor erred as a matter of law in ruling the contract was ambiguous.
 

 ¶ 16. Contract construction and interpretation requires that the court first consider whether the contract is ambiguous.
 
 Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.,
 
 857 So.2d 748, 751(¶ 7) (Miss.2003). If the contract is determined to be ambiguous, the subsequent interpretation of the contract presents a question of fact and is reviewed on appeal under the deferential substantial evidence/manifest error standard.
 
 Id.
 
 at 752(¶ 8). Alternatively, if the contract is unambiguous, this Court must accept the plain meaning of a contract as the intent of the parties.
 
 Fer-rara, v. Walters,
 
 919 So.2d 876, 882(¶ 13) (Miss.2005).
 

 
 *1153
 
 ¶ 17. The Mississippi Supreme Court has set out a three-tiered approach to contract interpretation.
 
 Royer Homes,
 
 857 So.2d at 752(¶ 10) (citing
 
 Pursue Energy Corp. v. Perkins,
 
 558 So.2d 349, 351-53 (Miss.1990)). First, the familiar four-corners test is applied where the court examines the language that the parties used in expressing their agreement, looking within the “four corners” of the agreement whenever possible to determine how to interpret it.
 
 Id.
 
 (citing
 
 McKee v. McKee,
 
 568 So.2d 262, 266 (Miss.1990)). We read the contract as a whole in order to give effect to all of its clauses.
 
 Id.
 
 (citing
 
 Brown v. Hartford Ins. Co.,
 
 606 So.2d 122, 126 (Miss.1992)). Particular words or phrases should not control, but rather, the entire document should be examined.
 
 Pursue Energy,
 
 558 So.2d at 352 (quoting
 
 Mounger v. Pittman,
 
 235 Miss. 85, 88, 108 So.2d 565, 567 (1959)). However, the four-corners analysis is only feasible when the contract is clear and unambiguous.
 
 McKee,
 
 568 So.2d at 266 (citing
 
 Pursue Energy,
 
 558 So.2d at 352).
 

 ¶ 18. Second, if the court is unable to clearly determine the parties’ intent, then the court should apply the discretionary canons of contract construction.
 
 Roy-er Homes,
 
 857 So.2d at 753(¶ 11) (citing
 
 Pursue Energy,
 
 558 So.2d at 352). Foremost among these canons is that when the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party.
 
 Id.
 
 Stated differently, any ambiguities in the contract will be construed against the party who drafted it.
 
 Wade v. Selby,
 
 722 So.2d 698, 701(¶ 9) (Miss.1998) (citing
 
 Estate of Parker v. Dorchak,
 
 673 So.2d 1379, 1382 (Miss.1996)).
 

 ¶ 19. Finally, after applying the above steps, “if the contract continues to evade clarity as to the parties’ intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements, and conversations might be considered in determining the parties’ intentions in the construction of the contract.”
 
 Royer Homes,
 
 857 So.2d at 753(¶ 11) (internal citations omitted).
 

 ¶ 20. The Henrys argue that the chancellor erred as a matter of law when he ruled that the phrase in the contract as related to the three structures on the property was ambiguous. They claim that the language “the Vendees assuming the responsibility of’ was unambiguous. The Henrys claim that the phrase “assume the responsibility of’ is commonly understood to mean that one promises to undertake an obligation or task. Therefore, they argue that the Moores breached the contract by failing to assume responsibility for the maintenance of the three structures on the property which resulted in damage to one of the structures—the law office. The Henrys contend this lack of maintenance was “a material repudiation of the contract’s terms” that should void the contract. They also note that the phrase “assuming the responsibility of’ appears in the consideration section of the agreement. Because of this placement, the Henrys conclude that the Moores’ performance of maintenance of the structures is implied.
 

 ¶ 21. We find the special chancellor did not err in finding the contractual phrase “assuming the responsibility of’ ambiguous; therefore, it was necessary for the court to determine the intent of the parties outside of the four corners of the document. Throughout their brief, the Henrys infer the “responsibility” stated in the contract is for “maintenance” and “care of’ the property’s structures, when in fact, these words are not present in the contract. The contractual ambiguity arises from the fact that it is unclear from the
 
 *1154
 
 way the contract is written what the Moores have assumed the responsibility of doing.
 

 ¶ 22. Because the contract was found to be ambiguous, the chancellor was also correct in applying the discretionary canons of contract construction. Specifically, the contract may be construed against the drafter, George, who had training as an attorney. We find no error in the special chancellor’s determination that the intent of the phrase “assuming the responsibility of’ meant that George was freeing himself from any obligation to make repairs to the structures. Relatedly, the special chancellor also properly found that the Moores could choose to repair the structures or not, because George had little doubt that the Moores would ultimately purchase the property. The special chancellor notes, and we agree, that one indication of this intent is the fact George, in drafting the contract, chose to refer to the parties as the “vendors/vendees” and not as the “lessors/lessees.” The term “ven-doi'” denotes “a person who transfers property or goods by
 
 sale.”
 
 Black’s Law Dictionary, 1555 (6th ed.1990) (emphasis added). We find that the foregoing determinations by the chancellor are supported by substantial evidence in the record.
 

 ¶ 23. Furthermore, we are not persuaded by the Henrys argument that because the phrase is located near the consideration section of the agreement, this means the drafter intended for the Moores to maintain the property’s structures. Again, the Henrys are inferring that the phrase “assuming the responsibility of’ is for maintenance of the structures, but we find no such language within the contract and no such intent outside of the contract. Re-latedly, the Henrys argue that the special chancellor’s interpretation of the contractual language that Moore could choose to repair the property’s structures or not creates inadequate consideration, as the Moores’ failure to maintain the structures provides neither a benefit to the Henrys or a detriment to the Moores. We disagree, as George would have the benefit of not having to maintain the structures while he owned the property, and the Moores would have the detriment of either having to repair the structures while leasing the property or having dilapidated structures on property they would purchase in the future.
 

 ¶ 24. In support of their position that the phrase — “assuming the responsibility of’ — is unambiguous, the Henrys cite to
 
 Owen v. Gerity,
 
 422 So.2d 284 (Miss.1982) and
 
 Benchmark Health, Care Center, Inc. v. Cain,
 
 912 So.2d 175 (Miss.Ct.App.2005), where they claim similar language has been construed in contractual agreements. We find neither determinative. In
 
 Owen,
 
 a divorce case, the court found that the term “bills” in the parties’ separation agreement did not include a promissory note executed by the parties because the contract did not specifically state the ap-pellee was responsible for it.
 
 Owen,
 
 422 So.2d at 288. We find that
 
 Owen
 
 is not on point with the instant case because the ambiguity at issue was not with regard to what the parties were “responsible” for generally, but whether the appellee was “responsible” specifically for paying the promissory note, which was not mentioned with the other bills in the agreement.
 
 Id.
 
 In the instant case, it is ambiguous what the Moores were
 
 generally
 
 responsible for doing. Additionally, this case supports the Moores’ position that any ambiguity or vagueness should be construed more strictly against the preparer of the document, which in
 
 Owen
 
 was the appellee.
 
 Id.
 

 ¶ 25. In
 
 Benchmark,
 
 this Court held that a contract was unambiguous as it clearly stated that one party would be “responsible for billing for services, [and]
 
 *1155
 
 collecting payment from third party payors and/or patients.”
 
 Benchmark,
 
 912 So.2d at 182(¶ 18). We found that the clear language of the contract stated what the party was “responsible for”; therefore, the lower court was correct in not allowing parol evidence to vary or alter the agreement.
 
 Id.
 
 Again, this case is not on point. In
 
 Benchmark,
 
 there was clear and unambiguous language in the contract stating what the party would be “responsible for.” In the instant case, unlike
 
 Benchmark,
 
 the contract contained no such clear statement of what the Moores were responsible for doing.
 

 ¶ 26. We find the special chancellor did not err as a matter of law or fact, respectively, in finding that the contract was ambiguous and that the Moores were not obligated by the language of the contract to maintain the structures on the property.
 

 2. Whether the Moores’ failure to maintain the structures on the property equates to failure to provide consideration and, therefore, a material breach of the contract that justifies the Henrys’ termination of the contract.
 

 ¶ 27. The Henrys next argue that if the contract is interpreted to mean the Moores had the responsibility to maintain the structures on the property, the Moores’ failure to maintain the structures amounted to a failure of consideration justifying George’s termination of the lease/purchase contract. Since we hold the special chancellor was correct in finding that the Moores did not have responsibility for maintaining the structures on the property, this issue is moot.
 

 3. Whether the final judgment must be reversed or vacated because it provides a remedy neither party requested.
 

 ¶ 28. The Henrys final argument is that the special chancellor granted relief which neither party requested. The ruling of the court was that the Henrys were to execute a quitclaim deed to the Moores for the property, and the Moores were ordered to pay them the $15,000 purchase price for which George had contracted. The Henrys contend that specific performance cannot be enforced against anyone but George and his wife, both of whom are deceased, and since this is a “personal action” against George and his wife that has survived their deaths, the chancellor’s judgment must be vacated or reversed and the case remanded to inquire into their heirship. The Henrys also claim that the chancery court’s order effectively voids the quitclaim deed from George and his wife to the Henrys.
 

 ¶ 29. This issue was not raised in the chancery court proceedings; therefore, it cannot be raised on appeal. Failure to raise an issue in a trial court procedurally bars the issue on appeal.
 
 Daniels v. Bains,
 
 967 So.2d 77, 81(¶ 13) (Miss.Ct.App. 2007). Procedural bar notwithstanding, this issue is without merit. George and his wife, Geraldine, quitclaimed the property to the Henrys prior to their deaths; therefore, it is questionable under what circumstance any of the other Henry heirs could have an interest in the property. While the deed was voidable by the Moores due to their previously recorded option, there is no indication in the record that the quitclaim deed was void so as to bring the property back into George’s and Geraldine’s estates.
 
 See generally
 
 John M. Cartwright, Glossary of Real Estate Law 995 (The Lawyers Co-operative Publishing Co. 1972) (distinction between void and voidable instruments). In the event that it is claimed at a later date that the heirs of George and Geraldine have an interest in the property at issue, the
 
 *1156
 
 Moores may have to enter proceedings to quiet title. However, as between the parties before us, we find the execution of the quitclaim deed between the Henrys and the Moores proper. We find that the special chancellor’s final judgment provides an equitable remedy which the Moores sought. It was supported by substantial evidence and was reasonable in light of the unusual facts and circumstances of the case.
 

 ¶ 30. THE JUDGMENT OF THE CHANCERY COURT OF OKTIBBEHA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . At the time of the trial, November 15, 2002, George F. Henry, Jr., was eighty-nine years old, paralyzed from an automobile accident and living in a Tennessee nursing home. His wife, Geraldine P. Henry, died on April 11, 2000. George passed away on November 4, 2004. Both Geraldine and George were removed as defendants/appellants by a supreme court order entered on October 11, 2007, following a motion to dismiss deceased parties filed by the appellants.