# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-00410-COA

**RAY M. WARD AND MARY K. WARD**                                      **APPELLANTS**

**v.**

**MARILYN DENISE CRANFORD**                                               **APPELLEE**

DATE OF JUDGMENT:                01/07/2020
TRIAL JUDGE:                            HON. JOSEPH KILGORE
COURT FROM WHICH APPEALED:    CHOCTAW COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS:      KELSEY LEIGH DISMUKES
                                J. LANE GREENLEE
ATTORNEY FOR APPELLEE:          JAY HOWARD HURDLE
NATURE OF THE CASE:              CIVIL - CONTRACT
DISPOSITION:                     REVERSED AND REMANDED - 08/24/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND WESTBROOKS, JJ.

### WILSON, P.J., FOR THE COURT:

¶1.     Marilyn Cranford entered into a lease-purchase agreement to buy a house from Ray and Mary Ward. The lease term was three years, and the contract gave Cranford an option to buy the property "at any point during the term of [the] lease for the sum of $44,000.00." The contract also provided that "$400.00 of [each] monthly lease payment shall be credited against the purchase price." Near the time the contract was executed, Cranford paid the Wards a total of $20,000 by three separate checks. Two of the checks were dated ten days prior to the parties' contract, and the third was dated the same day as the contract. However, the contract itself made no mention of the $20,000.

¶2. Prior to the end of the three-year lease term, Cranford notified the Wards that she intended to exercise her purchase option. Cranford tendered a cashier's check of $9,600, which she stated was the remaining balance due after deducting her initial payments totaling $20,000 and $14,400 credit for monthly rent payments. The Wards rejected Cranford's check, asserting that her initial payments totaling $20,000 did not count toward the purchase price. Cranford then filed suit for specific performance, and the Wards answered and filed a counterclaim for ejectment. After a trial, the chancellor held that the contract was unambiguous, that the purchase price for the property was $44,000, and that Cranford validly exercised the purchase option by tendering the balance due of $9,600. The chancellor granted specific performance and ordered the Wards to deed the property to Cranford.

¶3. On appeal, the Wards argue that the parties' contract is unambiguous and that the chancellor misapplied the "four corners doctrine." They further argue that the chancellor improperly considered parol evidence by ruling that Cranford's initial payments totaling $20,000 counted toward the purchase price. Finally, they argue that the chancellor erred by ordering specific performance and that Cranford should have been ejected.

¶4. We conclude that the parties' contract is ambiguous and unclear with respect to whether Cranford's initial payments totaling $20,000 should be counted toward the purchase price. Therefore, the chancellor erred by holding that the contract was unambiguous. We reverse and remand for the chancellor to consider all relevant evidence, including parol or extrinsic evidence; to make findings of fact as to the parties' intent regarding the disputed $20,000; and to grant appropriate relief.

## FACTS AND PROCEDURAL HISTORY

¶5.    Cranford contacted Mary K. Ward ("Kathy") about an advertisement that Kathy had posted on Facebook about a home for sale in Ackerman.  Cranford testified that Kathy agreed to enter into a lease-purchase contract because Cranford needed to move quickly but could not secure financing.  Cranford and the Wards later signed a lease-purchase contract with a three-year lease term and a monthly rent of $550.  In addition, Cranford was required to pay for insurance and property taxes.[1]  If Cranford failed to make any payment required by the lease within thirty days after the payment became due, the Wards had the right to terminate the lease and retake possession.[2]  The contract included the following purchase option:

> Option to Purchase:  Lessor hereby grants to Lessee an option to purchase the . . . property at any point during the term of this lease for the sum of $44,000.00.  $400.00 of the monthly lease payment shall be credited against the purchase price.  Lessee may make additional payments during the term of this lease against the option price.  Should Lessee's [sic] exercise their [sic] option to purchase, Lessor shall convey the property to Lessee via special warranty deed.

> In the event Lessee is unable or should not exercise this option to purchase, Lessee shall not be entitled to a refund of any of the rental paid, nor shall they be entitled to any payment for the improvements or repairs made to the property.

¶6.    At trial, the Wards' attorney asked Cranford whether Kathy ever expressed a preference for an outright sale rather than a lease with an option to purchase.  Cranford's attorney objected that Kathy's preference was "inadmissible parol evidence and beyond the

---

[1] Cranford paid the Wards $78 per month for insurance, so her actual monthly check to the Wards was $628.  Cranford paid the property taxes directly to the county.

[2] The contract did not grant Cranford a right to terminate.

3

four corners of the [contract]." The chancellor sustained the objection but allowed the Wards' attorney to make a proffer. The attorney proffered that Kathy "preferred . . . an outright sale of the property, but in order to help . . . Cranford, she did agree to lease with option to purchase."

¶7. Cranford testified that she understood that if she did not exercise the purchase option, she would not be entitled to a refund of any rent payments she had made. She said that she was okay with that because $550 per month was a reasonable rent. Cranford denied that she signed any other document related to the lease or purchase of the property. The Wards' attorney showed Cranford what the Wards claimed was a preliminary handwritten agreement with a sale price of $64,000. The handwritten document stated in full:

March 2015

$64,000 Balance
(Without my storage)
She may use it while it is on her property. A contract of her home will be drawn up.

Denise Cranford<br>Mary K. Ward

Kathy subsequently testified that the "Balance" was the agreed upon purchase price. Kathy said the "storage" was a barn on the property. According to Kathy, her husband planned to move the barn from the property, but they permitted Cranford to make use of it until it was moved. However, Cranford testified that she did not recognize the document, and she denied that the signature on the document was hers.

¶8. Cranford testified that she always intended to buy the house and that she paid $20,000 down toward the purchase price at the outset of the lease period. Her down payment

4

consisted of three checks:

- a $5,000 check (#5443) that Cranford signed on March 3, 2015, which posted on March 5;

- another $5,000 check (#5444) that Cranford signed on March 3, 2015, which posted on March 16; and

- a $10,000 check (#5446) that Cranford signed on March 13, 2015—the same day as the parties' contract—which posted on March 19.

Cranford testified that these payments were "to go towards the purchase of the house."

¶9. Over the course of the three-year lease term, Cranford made all monthly rent payments,[3] and on March 8, 2018, she sent the Wards a letter notifying them of her intent to exercise the purchase option. The letter stated in part, "I have paid $20,000 in 2015 and since that time I have paid $14,400 as per the contract[4] leaving a balance of $9,600 in accordance with the same contract." Cranford also tendered a cashier's check for $9,600 and asked the Wards to agree to a closing date.

¶10. On April 19, 2018, the Wards responded through their attorney that $9,600 was "nowhere near the amount needed to pay the remaining balance." The Wards asked Cranford to provide documentation to support her calculation. They also "urge[d]" Cranford to "resume payment on the lease if [she] wish[ed] to maintain it." Cranford testified that she did not believe that she owed any additional rent payments, but she attempted to make two

---

[3] Cranford's payments were late at times. The Wards raised this issue in the trial court, but the chancellor ruled that the Wards waived any breach by accepting the late payments. The Wards do not challenge this aspect of the chancellor's ruling on appeal.

[4] This figure was based on the provision of the contract granting Cranford $400 credit toward the purchase price for each of her thirty-six monthly lease payments.

5

additional rent payments "[t]o satisfy [the] letter."

¶11.  On May 1, 2018, Cranford received a letter from the Wards' attorney stating that the Wards had "concluded that [Cranford had] breached the agreement on numerous occasions." The Wards stated that they would "seek legal process to evict" Cranford if she did not vacate the property within fourteen days.

¶12.  On May 15, 2018, the Wards' attorney sent Cranford a final letter.  The Wards offered Cranford a "final opportunity" to resolve the "dispute" and exercise the purchase option by paying $33,915.[5]  The Wards stated that if Cranford did not make that payment or vacate the property within fourteen days, they would file suit to evict her.  The Wards also returned the two recent rent payments that Cranford had attempted to make.

¶13.  Cranford filed a complaint against the Wards in the Choctaw County Chancery Court, seeking specific performance of the parties' contract.  The Wards filed an answer and a counterclaim for ejectment, alleging that Cranford had breached the lease agreement.

¶14.  Kathy testified at trial that she had offered the property for sale on Facebook.  The Wards attempted to offer as an exhibit what appears to be a copy of a photograph of Kathy's Facebook post.  They argued that the post was relevant to show their alleged asking price for the property.  However, Cranford objected, and the chancellor sustained the objection, ruling that the original asking price was not relevant to the contract.  As a result, the document was

---

[5] Even accepting the Wards' position that Cranford's initial payments totaling $20,000 did not count toward the contractual purchase price, Cranford still only owed a balance of $29,600 by the end of the lease.  The Wards' letter did not explain how they arrived at the higher figure of $33,915.

marked for identification only.[6]  Kathy testified that Cranford initially asked if they could "take . . . less for the house."  Kathy said she could not accept less than the asking price without talking to her husband, Ray, and Ray later agreed to reduce the price but exclude a barn on the property from the sale.  Kathy testified that she told Cranford that they would remove the barn from the property later but that Cranford could use it until it was moved.

¶15.    As discussed above, Kathy testified that she and Cranford signed a preliminary handwritten agreement to sell the property—except for the barn—for $64,000.  However, Kathy admitted that the $64,000 purchase price and the barn were never mentioned in the actual lease-purchase agreement.  Kathy testified that she was "shocked" in March 2018 when Cranford tendered $9,600 as payment in full.  She testified that Cranford still owed $33,600 at the time.[7]  On cross-examination, Cranford's attorney asked Kathy whether it was her position that Cranford had "paid the $20,000 for the privilege of entering into this lease-purchase agreement."  Kathy answered, "She did."  Kathy also testified, "I don't want the house back.  [Cranford] has made that home.  That's fine.  I just want to be paid for what I

---

[6] Although the document was not admitted into evidence, it is part of the record on appeal.  The alleged asking price is not contained in the original Facebook post but rather is in a comment that Kathy posted after the original post.  From the face of the document, it appears that the relevant comment was posted approximately three years after the original post—quite possibly after this dispute arose.  In support of their motion for a new trial, the Wards submitted a copy of a photograph of a different Facebook post advertising the house.  In that document as well, the alleged asking price is not contained in the original post but in a comment that Kathy posted after the original post.  From the face of the document, it is impossible to tell when Kathy posted that comment.

[7] As noted above, *see supra* note 5, even accepting the Wards' position, Cranford only owed $29,600 at the end of the lease.

owe on my house."[8]

¶16.    The chancellor subsequently delivered a bench opinion, which was incorporated into the final judgment.  The chancellor summed up the dispute as "whether $20,000 paid around the time of the contract execution should be included in the calculation of the overall purchase price, or whether the contract is complete."  Looking at the "four corners" of the lease-purchase agreement, the chancellor held that its language was clear and unambiguous and "should be enforced."  The chancellor concluded that there was no enforceable contract to sell the property for $64,000 because the alleged oral agreement was unenforceable,[9] and the handwritten note allegedly signed by Cranford and Kathy included no description of the property.[10]  He concluded that the lease-purchase agreement was the only enforceable contract and that it granted Cranford an option to purchase the property for $44,000.  He noted that Cranford showed she had already paid $34,400—her initial payments totaling $20,000 and $14,400 in credit for her monthly rent payments—and thus owed only $9,600, which she had tendered to the Wards.  Accordingly, the chancellor ruled that Cranford was entitled to specific performance.  He ordered the Wards to convey the property to Cranford

---

[8] Kathy testified that "[t]he house [was] still mortgaged" at the time of trial.  Her attorney asked her about the remaining balance on the mortgage, but the chancellor sustained Cranford's objection to the question.  As noted above, despite Kathy's testimony that she only wanted to be paid, the Wards' complaint requested ejectment, and their attorney reaffirmed at the close of the evidence that they were requesting that relief.

[9] See Miss. Code Ann. § 15-3-1(c) (Rev. 2019) (stating that no action shall be brought "upon any contract for the sale of lands" unless the contract is "in writing").

[10] See, e.g., Woodruff v. Thames, 143 So. 3d 546, 554 (¶19) (Miss. 2014) ("The description of the land in a contract for the sale of real property is unquestionably an essential term that must be stated with specificity.").

by special warranty deed once Cranford had again tendered $9,600.

¶17. The Wards filed a motion for a new trial, which the chancellor denied, and then filed a notice of appeal. On appeal, the Wards argue that the lease-purchase agreement is unambiguous, that the purchase option required Cranford to pay $44,000 "during the term of [the] lease," and that Cranford's initial payments totaling $20,000 were made prior to the term of the lease and therefore did not count toward the purchase price. Therefore, they argue that the parol evidence rule bars any testimony or evidence regarding Cranford's "pre-lease payments" and that Cranford should have been ejected because she failed to tender the full purchase price.

**ANALYSIS**

¶18. We will not disturb a chancellor's findings of fact unless they are manifestly wrong or clearly erroneous or the chancellor applied the wrong legal standard. *Henry v. Moore*, 9 So. 3d 1146, 1152 (¶15) (Miss. Ct. App. 2008), *cert. denied*, 12 So. 3d 531 (Miss. 2009). However, we review issues of law de novo. *Id.* Questions involving the construction and interpretation of contracts are questions of law that we review de novo. *Id.*

¶19. "The question of law/question of fact dichotomy requires a two-step inquiry in contract law." *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 751 (¶7) (Miss. 2003). First, the court must determine whether the contract is ambiguous. *Id.* at 751-52 (¶7). If the contract's terms are clear and unambiguous, then the contract must be enforced as written. *Id.* Whether a contract is ambiguous is a question of law for the court to decide and is subject to de novo review on appeal. *Id.* at 752 (¶7).

¶20.    If the contract is ambiguous, "the subsequent interpretation presents a question of fact for the [trier of fact]." *Id.* at (¶8); *accord Henry*, 9 So. 3d at 1152 (¶16).  A contract is ambiguous if it is "subject to more than one reasonable interpretation." *Royer Homes*, 857 So. 2d at 752 (¶8).  We review the fact-finder's interpretation of an ambiguous contract, which is an issue of fact, "under the deferential substantial evidence/manifest error standard." *Henry*, 9 So. 3d at 1152 (¶16); *accord Royer Homes*, 857 So. 2d at 752 (¶8).

¶21.    The Mississippi Supreme Court follows "a three-tiered approach to contract interpretation." *Royer Homes*, 857 So. 2d at 752 (¶10).  First, we apply "the 'four corners' test" and attempt to determine the meaning of the contract based solely on "an objective reading of the words employed in the contract." *Id.*  "Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Id.*  We "are not at liberty to infer intent contrary to that emanating from the text at issue." *Id.*

¶22.    Second, if an analysis of the "four corners" of the contract "does not yield a clear understanding of the parties' intent," the court may next consider any "applicable 'canons' of contract construction." *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 352 (Miss. 1990).  For example, one canon holds that when "the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party." *Royer Homes*, 857 So. 2d at 753 (¶11).  In the present

10

case, neither party has cited any relevant canons of construction.[11]

¶23.    Third, if the contract remains ambiguous, the fact-finder "should consider extrinsic or parol evidence," including evidence of "prior negotiation[s], agreements[,] and conversations." *Id.* At this step, the fact-finder must consider "the totality of the circumstances" surrounding the execution of the contract in an effort to determine "the parties' intent." *Pursue Energy*, 558 So. 2d at 353. Indeed, when a contract "is ambiguous, courts are obligated to pursue the intent of the parties by resort to parol evidence." *Kight v. Sheppard Bldg. Supply Inc.*, 537 So. 2d 1355, 1358 (Miss. 1989).

¶24.    Thus, we begin our analysis by determining whether the chancellor correctly held that the parties' contract is clear and free from ambiguity.[12] In general, there are two kinds of ambiguity. "Ambiguity may be *patent*—appearing 'on the face of the contract'—or *latent*—'arising from words which are uncertain when applied to the subject matter of the contract.'" Keith A. Rowley, *Contact Construction and Interpretation: From the "Four Corners" to Parol Evidence (and Everything in Between)*, 69 Miss. L.J. 73, 91 (1999) (footnotes and brackets omitted) (quoting *Burton v. Choctaw County*, 730 So. 2d 1, 8 (¶33) (Miss. 1997), and *IP Timberlands Operating Co. v. Denmiss Corp.*, 726 So. 2d 96, 110 (¶59) (Miss. 1998)); *accord* 11 Richard A. Lord, *Williston on Contracts* § 33:43, at 1194 (4th ed. 2012). A "latent ambiguity" arises when a "writing appears on the face of it[] certain and

---

[11] Cranford testified that she did not draft the lease-purchase agreement, but there was no evidence as to who did draft it.

[12] As noted above, this is a question of law that we review de novo on appeal. *Royer Homes*, 857 So. 2d at 751-52 (¶7).

11

free from ambiguity, but the ambiguity is introduced by evidence of something extrinsic, or by some collateral matter out of the instrument." *Brown v. Guice*, 46 Miss. 299, 301-02 (1872); *accord Peacher v. Strauss*, 47 Miss. 353, 365 (1872). Relevant parol or extrinsic evidence should be used to resolve a latent ambiguity. *Peacher*, 47 Miss. at 365; *Brown*, 46 Miss. at 302.

¶25.  In the present case, both the Wards and Cranford argue that the language of the lease-purchase agreement is unambiguous. However, they argue that it unambiguously means two very different things. The Wards emphasize that the contract granted Cranford the right to buy the property "at any point *during the term of* [*the*] *lease* for the sum of $44,000.00." (Emphasis added). They further emphasize that the contract allowed Cranford to "make additional payments *during the term of* [*the*] *lease* against the option price." (Emphasis added). The Wards argue that Cranford's initial payments totaling $20,000 were made *prior to* the lease term, not during it. They contend that under the unambiguous terms of the contract, those payments did not count toward the $44,000 contractual purchase price. The Wards further argue that the chancellor improperly allowed "parol evidence" regarding those payments to contradict the unambiguous terms of the parties' contract.

¶26.  In contrast, Cranford argues that the chancellor correctly ruled that the contract unambiguously establishes a purchase price of $44,000—not $64,000, as the Wards claim. Cranford further argues that the chancellor correctly deducted her initial payments totaling $20,000 from the contractual purchase price.

¶27.  Although both parties argue otherwise, we conclude that their contract is ambiguous.

12

Specifically, a latent ambiguity arises when we attempt to apply the terms of the contract to Cranford's March 2015 payments to the Wards. As discussed above, Cranford paid the Wards a total of $20,000 in March 2015. She wrote them two $5,000 checks dated ten days prior to the parties' contract and one $10,000 check dated the same day as the parties' contract. There is no dispute that these payments were related to the purchase of the property. Kathy testified at trial that the payments were consideration for the mere "privilege of entering into [the] lease-purchase agreement." And on appeal, the Wards only vaguely refer to the payments as "pre-Lease payments." In contrast, Cranford claims that the payments were a down payment that must be counted toward the contractual purchase price.

¶28. Yet these payments totaling $20,000—which, according to the parties, amount to roughly one-third or one-half of the value of the house—are not even mentioned in the parties' contract. Moreover, the language of the contract does not clearly and unambiguously resolve how those payments should be treated. The Wards emphasize that the contract permitted Cranford to buy the property "during the term of [the] lease" and to "make additional payments during the term of [the] lease." But the fact that Cranford could buy the property and make payments "during" the lease does not directly address the question whether her prior payments should also be counted toward the contractual purchase price. In addition, the contract does not define or specify the start date of "the term of [the] lease." Finally, the Wards also fail to account for the fact that Cranford paid $10,000 of the disputed $20,000 on the same day the contract was signed. They do not explain why, at minimum, that $10,000 payment should not count toward the purchase price.

¶29. In contrast, Cranford argues that the chancellor correctly concluded that the contract was unambiguous because it clearly provided for a purchase price of $44,000—not $64,000, as the Wards claimed. But the clarity of the purchase price also does not answer the question whether Cranford's March 2015 payments count toward the purchase price. Cranford had already paid $10,000 prior to the date of the lease and paid another $10,000 on the date of the lease, yet those payments are not mentioned in the contract. The contract's complete silence on this issue leaves it ambiguous as to whether the parties intended for the $20,000 to count toward the contractual purchase price or instead regarded it as additional consideration on top of the amount stated in the contract.

¶30. "A contract is ambiguous when it 'can be interpreted as having two or more reasonable meanings.'" *Austin v. Carpenter*, 3 So. 3d 147, 150 (¶14) (Miss. Ct. App. 2009) (quoting *Miss. Farm Bureau Cas. Ins. Co. v. Britt*, 826 So. 2d 1261, 1265 (¶14) (Miss. 2002)), *cert. denied*, 12 So. 3d 531 (Miss. 2009). For the reasons discussed above, the contract in this case is susceptible to two different reasonable interpretations with respect to the proper treatment of the disputed payments totaling $20,000. Accordingly, the contract is ambiguous. Therefore, applying a de novo standard of review, *Royer Homes*, 857 So. 2d at 751-52 (¶7), we hold that the chancellor erred by ruling that the contract was "clear" and "free from ambiguity" under "the 'four corners' test." For the same reason, the chancellor also erred by declining to consider parol evidence related to the negotiations leading up to the execution of the contract.

¶31. Because the contract is ambiguous, the chancellor should consider all "extrinsic or

14

parol evidence" that is relevant and probative regarding the parties' intent with respect to the disputed $20,000. *Pursue Energy*, 558 So. 2d at 353. The "totality of the circumstances" leading up to the execution of the contract, including any evidence of "negotiations between the [parties]," "may help reveal the parties' intent" on this dispute of fact. *Id.* Accordingly, we reverse and remand for the chancellor to consider all relevant evidence, make findings of fact regarding the parties' intent on this issue of fact, and then determine the appropriate remedy.[13]

¶32.  **REVERSED AND REMANDED.**

**BARNES, C.J., GREENLEE, LAWRENCE AND SMITH, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD AND McCARTY, JJ. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND McDONALD, J.; McCARTY, J., JOINS IN PART.**

**WESTBROOKS, J., CONCURRING IN RESULT ONLY:**

---

[13] We note two issues that could arise on remand, although the parties have not addressed them at this point in the litigation. First, the parties' contract provides that Cranford "shall not be entitled to a refund of any of the rental paid" if she does not exercise the purchase option, but the contract does not address whether Cranford would be entitled to a refund of the disputed $20,000. Thus, Cranford could be entitled to a refund of or credit for some or all of those funds in the event she does not exercise the purchase option. *See Thomas v. Scarborough*, 977 So. 2d 393, 398-400 (¶¶14-19) (Miss. Ct. App. 2007) (holding that a provision of a lease-purchase agreement requiring the lessees to forfeit their $30,000 down payment in the event of a breach was "void" as an "unreasonable penalty"). Second, the chancellor could find that the parties never actually agreed upon or came to a mutual understanding as to whether the disputed $20,000 would count toward the purchase price. If that is the case, a question arises whether there was ever a "meeting of the minds," which is an essential element of an enforceable contract. *See Viverette v. State Highway Comm'n*, 656 So. 2d 102, 103 (Miss. 1995) (holding that there was no "meeting of the minds" regarding a settlement agreement when there was no evidence that the parties ever "considered and agreed upon" whether a prior payment should be deducted from the settlement amount). We express no opinion on these issues but simply note them as potential issues that may arise depending on the chancellor's factual findings on remand.

¶33. From my perspective, there are two issues on appeal: (1) whether the lease-purchase agreement between Cranford and the Wards is ambiguous; and (2) the purpose of the three March 2015 payments. The plurality analyzes the lease-purchase agreement in the context of latent ambiguity surrounding Cranford's payment of $20,000 to the Wards separately from the monthly rent. Based on the perceived ambiguous nature of the contract, the plurality remands the case for the chancellor to consider all relevant parol evidence pertaining to the three pre-lease payments. I agree that the chancellor should address this issue, but I do not agree with the plurality that the contract is ambiguous.

¶34. A contract is not ambiguous as a matter of law simply because the contracting parties disagree as to its meaning. *Turner v. Terry*, 799 So. 2d 25, 32 (¶17) (Miss. 2001). Based on the plain language contained in the lease-purchase agreement itself, with no extraneous evidence, a fact-finder would be hard-pressed to find any ambiguity. The "Lease With Option to Purchase" entered into by the parties differs from a standard lease agreement, yet the provisions are clearly set forth: instead of addressing only a set payment being remitted at regular intervals as rent, the contract gave Cranford the "Option to Purchase . . . for the sum of $44,000.00." And, in the event the purchase option was exercised, the monthly rent payments of $400 would be applied against the option price. The $20,000 in pre-lease payments are not addressed specifically or alluded to, but "silence alone does not necessarily create an ambiguity as a matter of law." *Facilities Inc. v. Rogers-Usry Chevrolet Inc.*, 908 So. 2d 107, 115 (¶19) (Miss. 2005) ("It is the *silence, not the language of the lease*, that has created this dispute."). Staying within the four corners of the document, the lease-purchase

16

agreement is unambiguous, and Cranford "exercise[d]" her option to purchase in accordance with the contract by remitting the $20,000.

¶35. A finding that the contract is unambiguous does not call for the Court to resolve the case any differently than a finding that it is ambiguous. Even if this lease-purchase agreement were found to be unambiguous, there would still be an issue remaining as to the purpose of the three pre-lease payments. *See Tupelo Redev. Agency v. Abernathy*, 913 So. 2d 278, 284 (¶14) (Miss. 2005) ("Where a contract is silent as to one of its terms, the court is not bound to adopt a construction . . . [that] no man in his right mind would have agreed to."). This case was filed in a court of equity, and the chancellor can and should make a decision as to the purpose of the March 2015 payments based on the principles of equity to ensure fairness to the parties. *See Shelton v. Shelton*, 477 So. 2d 1357, 1358-59 (Miss. 1985) ("[T]he principles of equity and righteous dealing [are] the purpose of the very jurisdiction of the [chancery] court to sustain."). It is the duty of the chancellor to ensure that neither party is unjustly enriched. The chancellor, as the trier of fact, is also in the best position to determine whether either party has violated the principles of equity, including, but not limited to, the "unclean hands doctrine." To the extent the chancellor can determine which party drafted the contract, this may also assist him in crafting an equitable resolution.

¶36. For the foregoing reasons I respectfully concur with the plurality in the result only.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION IN PART.**

**EMFINGER, J., DISSENTING:**

¶37. Because of circumstances involving elderly parents, Ray and Mary "Kathy" Ward

17

decided to sell their home in Ackerman, Mississippi. They listed the home for sale on Facebook. Marilyn Denise Cranford became aware of the listing, possibly from Facebook, and contacted Kathy. They entered into negotiations regarding the property in March 2015. Kathy testified that she and Cranford negotiated the purchase price, and, while originally asking $68,000 for the house, the Wards agreed to sell Cranford the house for $64,000 without a barn that was on the property. Cranford denies she agreed to a purchase price of $64,000. Cranford testified that she agreed to enter into a lease with the option to purchase because she was living in a home in Sturgis and needed to get out pretty quickly, and she needed time to remedy her credit score. In any event, prior to the execution of any written contract or agreement, Cranford gave the Wards three checks in the total amount of $20,000. The Wards contend the $20,000 was given as consideration for them to enter into the lease with the option to purchase with the sale price reduced from $64,000 to $44,000. Cranford contends that the $20,000 was given to the Wards as "good faith" money and was meant to apply toward the $44,000 option price. However, none of that really matters.

¶38. On March 13, 2015, the parties entered into a "LEASE WITH OPTION TO PURCHASE" that is not ambiguous and contained all the essential elements to form a valid and enforceable option contract. In his bench opinion the chancellor said:

> The Supreme Court will enforce a contract that is "clear, definite, explicit, harmonious in all its provision, and is free from ambiguity." Citing *Bert Allen Toyota, Inc. v. Grasz*, 909 So. 2d 763 (Miss. Ct. App. 2005).
>
> The court finds that the language used in the Exhibit 1 lease-purchase agreement falls within these parameters and should be enforced. It is reasonably complete and definite and thus allows for specific performance to be a specific remedy.

18

I agree with the chancellor that the agreement is "free from ambiguity," however I disagree with how he interpreted this unambiguous document to allow pre-lease payments to be credited against the purchase price stated in this option. The applicable provision of the agreement reads as follows:

> (10) <u>Option to Purchase</u>: Lessor hereby grants to Lessee an option to purchase the above described property at any point during the term of this lease for the sum of $44,000.00. $400.00 of the monthly lease payment shall be credited against the purchase price. Lessee may make additional payments **during the term of this lease against the option price**. Should Lessee's exercise their option to purchase, Lessor shall convey the property to Lessee via special warranty deed.

(Emphasis added).

¶39.    While Cranford testified that she intended the pre-lease payments to be evidence of her "good faith" to purchase the property and that she believed those payments would be credited against the option purchase price, the chancellor should not have considered such testimony. In *Royer Homes of Mississippi Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 752-53 (¶10) (Miss. 2003), the court said:

> This Court has set out a three-tiered approach to contract interpretation. *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-53 (Miss. 1990). **Legal purpose or intent should first be sought in an objective reading of the words employed in the contract <u>to the exclusion of parol or extrinsic evidence</u>**. *Cooper v. Crabb*, 587 So. 2d [236, 241 (Miss. 1991)]; *City of Grenada v. Whitten Aviation Inc.*, 755 So. 2d 1208, 1214 (Miss. Ct. App. 1999) [(negative history omitted)]. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. *Pursue Energy Corp.*, 558 So. 2d at 352 (citing *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975)). We must look to the "four corners" of the contract whenever possible to determine how to interpret it. *McKee v. McKee*, 568 So. 2d 262, 266 (Miss. 1990). When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. *Brown v. Hartford Ins. Co.*, 606 So. 2d 122, 126 (Miss. 1992). **Our concern is not**

**nearly so much with what the parties may have intended, but with what they said**, **since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy**. *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42-43 (Miss. 1992). **Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue**. *Id*. (citing *Cooper*, 587 So. 2d at 241). On the other hand, if the contract is unclear or ambiguous, the court should attempt to "harmonize the provisions in accord with the parties' apparent intent." *Pursue Energy Corp*., 558 So. 2d at 352. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. *Id*. "[T]he mere fact that the parties' disagree about the meaning of a contract does not make the contract ambiguous as a matter of law." *Turner* [*v. Terry*], 799 So. 2d [25, 32 (Miss. 2001)]; *Cherry v. Anthony*, 501 So. 2d 416, 419 (Miss. 1987).

(Emphasis added). Because the plain language of the agreement only allowed credit against the purchase price for "additional payments **during the term of this lease**," the chancellor clearly erred when he credited pre-lease payments in the amount of $20,000 to reduce the option price.

¶40. However, Cranford made all the monthly rental payments due under the lease and, pursuant to the agreement, was entitled to be credited $14,400 against the option price. On March 8, 2018, Cranford notified the Wards, in writing, of her intent to exercise the purchase option. In *Ing v. Adams*, 248 So. 3d 881, 885-86 (¶20) (Miss. Ct. App. 2018), the court said:

> "[W]ritten notice to the seller of intent of the option holder to exercise an option has the effect of an acceptance, converting the option into an enforceable bilateral contract. It is not necessary for an option holder to tender the purchase price in order to exercise the option." *Creely v. Hosemann*, 910 So. 2d 512, 519 (¶29) (Miss. 2005) (emphasis added) (citing *Busching v. Griffin*, 542 So. 2d 860, 864-65 (Miss. 1989) ). Indeed, "[a]bsent language in the contract to the contrary, an option holder has no obligation or duty to show an *ability* to pay the entire sales price before the closing." *Prestenbach* [*v. Collins*], 159 So. 3d [531, 534] (¶12) [(Miss. 2014)] (emphasis added). "The holder of an option is entitled to specific performance of the optioner's duty to convey, so long as the holder is willing to pay the option price." *Creely*, 910 So. 2d at 519 (¶29).

With the letter giving notice of her intent to exercise the option, Cranford tendered a cashier's check in the amount of $9,600, which she contended was the balance due under the agreement. The Wards rejected the offer and maintained that the $9,600 did not represent the balance due under the agreement. I agree with the chancellor that Cranford gave timely notice to the Wards of her intent to exercise the option. Because a good faith disagreement over the option price arose, closing was not possible within a reasonable time thereafter. Because Cranford timely gave the Wards notice of her intent to exercise the option, I would find that the option converted into an enforceable bilateral contract. Accordingly, once the dispute concerning the purchase price is resolved, Cranford should be given a reasonable time to close the transaction.

¶41. I dissent from the plurality opinion reversing the grant of specific performance. Instead, I would affirm the grant of specific performance but reverse and remand to alter the details of the grant. I would find that upon remand, the chancellor should order that upon Cranford's presentation of $29,600, plus interest from March 13, 2018, through closing, in an amount to be determined by the chancellor, the Wards shall present Cranford a special warranty deed as required by the agreement. Since I would find that Cranford has not breached the agreement and timely exercised the option, I would also affirm the denial of the Wards' claim for ejectment at this time.

**CARLTON, P.J., AND McDONALD, J., JOIN THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

21